BEHRENDT *v.* WILCOX.

1. Witnesses—Attorney and Client—Parties.
    Practice of attorneys for parties to *quo warranto* proceeding of testifying as to material matters is condemned.

2. Verdicts and Findings—Special Questions.
    Special questions must be plain and unambiguous and call for findings on questions of fact which are conclusive of the real issue involved in the case.

3. Quo Warranto—Sheriffs—Recount—Instructions.
    In *quo warranto* proceeding to try right to office of sheriff after recount had apparently changed result of close election, instruction to jury that if the county board of canvassers did conduct a fair and impartial recount, both parties would be bound by the result *held*, proper.

4. Same—Special Questions—Evidence.
    Special questions, put to jury in *quo warranto* proceeding to try right to office of sheriff, as to whether plaintiff or defendant had received plurality of votes *held*, proper hence refusal to give question proposed by defendant to have jury determine whether or not county board of canvassers had failed to conduct a recount was not error, where jury had before it the results of both the original count and the recount and testimony in detail of recount from which it could determine extent conspiracy, fraud or mistake, alleged to have occurred therein, affected the result.

5. Same—Special Questions—Instructions—Court Rules.
    Charging jury generally in *quo warranto* case submitted on special questions *held*, not error under court rule respecting submission of cases on special questions, where matters included in charge that were immaterial are not apparent nor specifically pointed out (Court Rule No. 37, § 7[1933]).

6. Verdicts and Findings—Special Questions—Court Rules.
    Court rule, respecting submission of special questions, was established to aid discovery of the truth, was not designed to trap a trial judge, nor based on a presumption that juries lack intelligence and must be kept from comprehending effect of their answers to such special questions (Court Rule No. 37, § 7 [1933]).

7. TRIAL—JURY—REQUESTS TO CHARGE—INSTRUCTIONS.

While it is improper to allow a jury to take to its room requests to charge marked ''given,'' it is not an abuse of discretion to permit the jury to have the court stenographer's transcript, if requested, with or without the consent or presence of counsel.

8. SAME—INSTRUCTIONS—JURY.

Claim that transcript of a charge to jury in trial of *quo warranto* proceeding contained a pencil marking *held,* inconsequential, where trial court was of opinion no markings were on copy of charge submitted to jury and that copy referred to was made after the case was concluded.

9. QUO WARRANTO—MUTILATED BALLOTS—EVIDENCE—INSTRUCTIONS.

In *quo warranto* proceeding to try right to office of sheriff, exhibition to jury of some ballot boxes containing mutilated and marked ballots, not for purpose of counting votes but merely as evidence of fraud, change or mutilation of ballots, *held,* not reversible error, where instructions required jury to determine from all the testimony which party received the most lawful votes at the election.

10. SAME—EVIDENCE.

In *quo warranto* proceeding to try right to office of sheriff, exclusion from evidence of a photostatic copy of private document, prepared by deputy county clerk and purporting to show résumé of number of ballots used by ward and district within a city in the county, *held,* proper in absence of showing clerk was required to prepare such document or as to accuracy of his work, notwithstanding production of the poll books had been unsuccessfully sought.

11. ELECTIONS—IRREGULARITIES.

An election is not to be set aside because of an irregularity unless it appears that the result was affected thereby.

12. SAME—IRREGULARITIES—QUO WARRANTO—BURDEN OF PROOF—EVIDENCE.

Plaintiff in *quo warranto* proceeding to try right to office of sheriff *held,* to have sustained burden of proving that irregularities in election changed its result as reported by county canvassing board.

13. COSTS—RECORD—BRIEFS.

No costs are allowed in *quo warranto* proceeding to try right to office of sheriff where record and briefs are in an unsatisfactory condition (Court Rule No. 5, §§ 2, 3 [1933]).

Appeal from Wayne; Gillespie (Glenn C.), J.
Submitted June 12, 1936. (Docket No. 108, Calendar No. 39,045.) Decided October 5, 1936.

Information in the nature of *quo warranto* by Henry Behrendt against Thomas C. Wilcox to determine the right to the office of sheriff of Wayne county. Verdict and judgment for plaintiff. Defendant appeals. Affirmed.

*Schmalzriedt, Frye, Granse & Frye,* for plaintiff.

*David V. Martin (Valois E. Crossley,* of counsel), for defendant.

Bushnell, J. At the general election, held November 6, 1934, plaintiff Henry Behrendt and defendant Thomas C. Wilcox were the opposing candidates for the office of sheriff of Wayne county. From the early, and unofficial, returns it became apparent that the race between the two would be exceedingly close, although the combined votes were about 350,-000 in the 1083 election precincts of the county.

Under the provisions of the Michigan election law (Act No. 351, Pub. Acts 1925 [1 Comp. Laws 1929, § 2747 *et seq.*], as amended) the board of county canvassers is required to meet on the third day after election and canvass the returns of the various boards of election inspectors (1 Comp. Laws 1929, § 3172). When this is completed the board is directed to prepare a written statement containing the number of votes cast for each office and the names of the persons for whom such votes are given. The law requires that this statement be filed with the county clerk. See 1 Comp. Laws 1929, §§ 3171–3180.

When the board met, 12 of the ballot boxes, according to the returns of the election inspectors,

appeared to contain more votes cast for some officers than there were voters listed in these precincts, and members of these precinct boards were called before the county canvassing board in an effort to correct the returns.

An assistant prosecuting attorney advised that the canvassing board could not reject the returns of the inspectors of election and an assistant attorney general advised the board that it had the power to "throw out the 12 precincts in question." Before the matter was concluded, plaintiff instituted mandamus proceedings to compel the board to canvass these returns. Three judges of the Wayne circuit, sitting *en banc,* considered plaintiff's petition and adjourned the matter in order to allow the board sufficient time to complete its canvass. The respective petitions of plaintiff and defendant for a recount of the votes in a large number of precincts was filed before the canvass was finished or the mandamus action finally determined.

Meanwhile other caldrons were brewing. At the same election the people voted for State officers including the secretary of State. The air was charged with claims of election irregularities and the governor was persuaded to call the State legislature to convene in extraordinary session in joint convention on December 10th for the purpose of considering the election contest between the rival candidates for the office of secretary of State. See *Wilson* v. *Atwood,* 270 Mich. 317; *In re Investigation of Recount,* 270 Mich. 328; *Behrendt* v. *Board of State Canvassers,* 269 Mich. 247; and *In re Wilkowski,* 270 Mich. 687. Under telegraphic orders of the governor, the clerk of Wayne county obtained and held in his custody certain ballot boxes all of which tended to delay the county recount which did not begin until 10 p. m. Thursday, December 27th

and continued thereafter contemporaneously with the "legislative inquiry into the election of the secretary of State," but upon separate floors in the same building in the city of Detroit.

December 28th, the Wayne circuit court issued its writ of mandamus commanding the board of canvassers of Wayne county to certify the election of Behrendt to the office of sheriff for the term commencing January 1, 1935. Application for leave to appeal was promptly made to this court and upon representations that the recount would be completed before that hour, a stay of proceedings was entered until 4 p. m. Monday, December 31st.

The county recount proceeded rapidly and apparently with great physical fatigue to all concerned because after an unsuccessful attempt to secure a recess late Saturday night for the purpose of rest, plaintiff's counsel and workers left the recount rooms. The recount continued in their absence and on Monday, the 31st, the county board certified from its findings that the total number of votes cast for the office of sheriff was 348,319, of which Wilcox received 170,475, and Behrendt 169,645, thereby giving Wilcox a plurality of 830.

The record contains an exhibit entitled "county canvassers statement and clerk's return," dated December 28, 1934, showing total vote 347,361, Behrendt 169,907, Wilcox 169,255, etc., thereby giving Behrendt a plurality of 652. This exhibit is signed by two members of the board not including the county clerk nor was it filed in his office.

This information in the nature of *quo warranto* was filed on January 12, 1935, pursuant to an order of the circuit court granting leave. The matter came on to be heard before Judge Glenn C. Gillespie of the Oakland circuit, sitting in Wayne with a jury. The testimony returned on appeal, which has been

reduced by the elimination of certain portions, deemed immaterial by counsel, still provides a record of 1,334 pages, all of which has been examined.

Defendant requested the court to submit the cause to the jury for their general verdict and in event of denial of this request to submit to the jury the following special questions, claiming authority therefor under Court Rule No. 37, § 7 (1933):

"1. Did the plaintiff Henry Behrendt receive a plurality of the lawful votes cast for the office of sheriff of Wayne county at the November, 1934, election?

"2. Did the members of the board of Wayne county canvassers comprised of D. J. Healy, Jr., Jacob P. Summeracki and Elmer B. O'Hara fail to conduct a recount of the votes cast for the office of sheriff of Wayne county?"

To avoid quotation of the lengthy colloquy, which explains the request and its refusal, we give the following from the opinion of the trial judge upon denying defendant's motion for a new trial.

"Counsel is in error in claiming that there was any change made by the court in the issues. At the opening of the trial and during the first few days of taking testimony counsel had intimated that the question to be determined was whether or not there had been a lawful recount. After much thought on the subject two special questions were framed and submitted to counsel with copies of the proposed charge at least ten days prior to the conclusion of the trial, and counsel were invited at their convenience to prepare and submit any additional requests or to suggest changes in the form of the questions.

"At the conclusion of the case defendant's counsel requested the court to submit the following special question:

"'Did the members of the board of Wayne county canvassers, comprised of D. J. Healy, Jr., Jacob P. Summeracki and Elmer B. O'Hara fail to conduct recount of the votes cast for the office of sheriff of Wayne county?'

"The difficulty with this question is that it was not determinative of the issues, and was not fair to the defendant. That there were some mistakes in counting votes during the recount was not seriously disputed. That fraud was perpetrated by some of the workers cannot be denied. But, with the elimination of such mistakes and fraud, if the final result showed that the defendant received more votes than the plaintiff, he was entitled to a verdict. Had the question offered by defendant's counsel been submitted, a finding by the jury that fraud had been committed in the recount would have been the equivalent of a verdict for the plaintiff.

"The real issue in the case was, which candidate received a plurality of the votes cast. The jurors had before them testimony as to the count of the votes made by the inspectors of election in the various precincts, and the finding of the board of county canvassers that plaintiff had received a plurality of the votes, although no certificate of election was ever issued to him. They also had testimony as to the result as found by the board of county canvassers on the recount. They had much testimony as to the manner in which the recount was conducted, and whether or not there was a conspiracy between certain members of the board of county canvassers to deprive plaintiff of the office; whether or not there was fraud or mistakes in counting the votes; whether or not the ballots had been marked in favor of the defendant, and whether ballot boxes and their contents had been tampered with so they could not be recounted. If plaintiff's charges in respect of fraud in the recount were sustained, and a fair and lawful recount had not been made, then the jurors might consider the vote as returned by the inspectors of election from the various precincts in order to decide which candidate received the most votes. A somewhat similar question was before the court in *At-*

*torney General, ex rel. Reynolds,* v. *May,* 97 Mich. 568, where the court said:

" 'The issue is clearly tendered in the replication that, after the canvass and return of the votes by the election inspectors, the ballot boxes· were tampered with, votes in favor of relator destroyed, and others in favor of the respondent inserted in their stead. If this be true, it is clear that the original returns of the votes must be taken, subject to be changed by any competent evidence to impeach them, or to show the actual ballots cast.'

"That there was no change in the issues is best evidenced by the statement of the court in overruling defendant's motion for a directed verdict at the close of plaintiff's case, where the following appears · in the record:

" 'As I have already intimated, gentlemen, I think the real question in the case is whether or not the plaintiff received a plurality of the votes cast in the election. That, of necessity, I think, creates an issue as to the lawfulness of the recount. If a recount was had, as contemplated by the statute, I think that the results supersede and take the place of any results determined from the canvass of the votes. I think it is a fair question for the jury to state whether or not an honest, fair recount was made by the board of county canvassers. If so, that controls; if not, the jurors, as they see fit, may disregard the result of that recount and determine for themselves from the original returns of the election inspectors and other evidence in the case, which of these candidates received the most votes. I think one of the big questions in the case, as I see it now, is going to be the lawfulness of the recount, whether or not it was a fair, lawful, honest recount as contemplated by the law. If so, the result controls; if, not, the jury may disregard it and signify their answer through other testimony.' "

The court in charging the jury submitted its own draft of two special questions, as follows:

"1.    Did the defendant, Thomas C. Wilcox, receive a plurality of lawful votes cast for the office of sheriff of Wayne county at the November, 1934, election?

"2.    Did the plaintiff, Henry Behrendt, receive a plurality of lawful votes cast for the office of sheriff of Wayne county at the November, 1934, election?"

The jury deliberated from Friday morning April 19th until 5 p. m. Saturday, the 20th, when they returned answer of "no" to the first question and

"yes" to the second, whereupon a judgment was entered against the defendant.

No attempt was made by either side during the course of the trial, to actually count the votes cast for the office of sheriff although several boxes and their contents were exhibited to the jury in support of plaintiff's claim that ballots had been illegally marked and mutilated. The proofs consisted of exhibits such as the report of the proceedings of the recount, stenographic records made when the various boxes were opened, the unsigned recapitulation of the canvass of votes in the various precincts and other papers. The oral testimony was almost entirely directed to the conduct and happenings of the recount. Many witnesses were called including the members of the county board, its employees and challengers of the parties. Notwithstanding comments in opinions of this court condemning the practice, attorneys for both parties were called and testified on material matters.

Through this maze of testimony run charges of mistake, fraud and conspiracy, made in bold language and as emphatically denied. That all concerned were working under severe strain and pressure is easily discernible from the record. The trial judge made every effort to exclude immaterial testimony regarding the contemporaneous "legislative inquiry into the election of the secretary of State" but notwithstanding his care the record is tinted with its proximity.

Had the trial judge acceded to the request of defendant and given the second question together with the one as to whether plaintiff received a plurality of the votes cast, the jury might possibly have returned contradictory answers from which it would have been impossible to enter a judgment.

The real issue was, who received the greater number of votes. *Harbaugh* v. *People, ex rel. Cicott,* 33 Mich. 241; *Attorney General, ex rel. Reynolds,* v. *May, supra,* and 22 R. C. L. p. 679. Nothing short of this would be decisive.

"Special questions—'must be plain and unambiguous and call for findings on questions of fact which are conclusive of the real issue involved in the case.' *Gilbert* v. *Stickley,* 204 Mich. 342, 345." *Farr* v. *Haggerty,* 273 Mich. 547.

The court properly charged the jury:

"If the members of the Wayne county board of canvassers did conduct a fair and impartial recount of the votes cast for the office of sheriff of Wayne county, both of the parties to this suit are bound by the determination of the Wayne county board of canvassers as to which of said parties received the greatest number of votes."

The requirements of the statute as to the conduct of elections were stated and the jury was informed that:

"The result of both counts is before you for your consideration in connection with all the other testimony in the case, and so that you may determine whether or not the recount was fair and honest and the defendant received more votes for the office than the plaintiff. Where a lawful recount is conducted the law provided that the board shall thereupon reject all of the previous returns from the precincts in question, except from precincts in which the ballots cannot be counted as I have heretofore explained, and upon the conclusion of such a recount the returns made by the board shall be deemed to be correct, anything in the previous returns by the inspectors of election in the various precincts to the contrary notwithstanding. If you should find, however, that by reason of conspiracy, fraud or mis-

takes, a correct count of the votes was not made by the county board of canvassers, then you have a right to disregard the result of such recount insofar as you find it was not true and correct, and determine the result from the original returns of the inspection of the election in each election precinct, subject to be changed by any competent evidence to impeach them or to show the actual ballots cast, and from all the testimony in the case find the total number of votes cast for each candidate, and which of the parties to this action received a plurality of such votes."

The jury had all the facts before it and its determination was "conclusive of the real issue involved in the case." An examination of the facts, on appeal, shows that the questions framed by the court were better adapted to the case than those proposed by defendant. *Chilson* v. *Wilson*, 38 Mich. 267.

Counsel asks:

"Did not the court err in instructing the jury generally, when the cause was submitted on a special verdict?"

Court Rule No. 37, § 7 (1933), provides that the special verdict shall be prepared by the court and instructions to the jury shall be limited to such matters as are material to the questions submitted. The charge is characterized as "general" and it is said that the jury was thereby informed of the effect their answers would have upon the ultimate rights of the litigants. It is rather difficult to understand from a reading of this record how anyone sitting on this jury could fail to apprehend the effect of their answers no matter what was said or left unsaid by the court. The limitation in the rule is upon the materiality of the matters included in the charge; that which is immaterial must be omitted. Counsel does not specifically point out the immaterial and

objectionable portions of the charge and our search has failed to disclose any irrelevant matters.

The rule was established as an aid for the discovery of the truth; it was not designed as a trap for trial judges, nor should it be used for the purpose of presuming that juries lack ordinary intelligence and therefore must be kept from comprehending the effect of their answers to special questions.

Did the court err in sending a copy of his written charge to the jury at its request without the consent or presence of counsel? Our information on this matter is limited to the following statement in the record:

"The record may show that the jurors have asked the court the following question which was submitted in writing to the court's officers:

" 'Does the original count in the November 6th election in its entirety stand if all the boxes in the count at the recount were not counted? Please send his honor's charge.'

"The officers in charge of the jury will be directed to return the written transcript of this charge for further consideration of the jurors."

We have held that it is not proper to allow the jury to take to their room requests to charge marked "given," *Hewitt* v. *Railroad Co.,* 67 Mich. 61, but it is not an abuse of discretion to permit the jury to have the court stenographer's transcript of the charge, if requested, and this with or without the consent or presence of counsel.

It is claimed that the transcript of the charge contained a pencil marking. The matter was investigated by the court upon the hearing of defendant's motion for a new trial and the court reporter's dictaphone operator was sworn. It appeared that the mark consisted of a cross placed upon the transcript to indicate where the one typist concluded and to

show another where to begin. The court reporter was also sworn but his testimony is not included in the record and we are, therefore, uninformed except that the court was of the opinion that no markings were upon the copy of the charge when it was given to the jury and that the copy referred to was made after the case was concluded. In the absence of any further showing to the contrary, the question seems to be inconsequential.

Error is claimed because two boxes containing mutilated and marked ballots were exhibited to the jury. Exhibit 39 was the box from precinct 8 of ward 9, and exhibit 40 the box of precinct 27 of ward 13, both of the city of Detroit. Defendant says these boxes were later recounted at the "legislative inquiry * * * where it must be admitted all kinds of irregularities occurred" and therefore their exhibition to the jury was prejudicial.

The court said in this connection:

"Counsel have been permitted to exhibit the contents of certain ballot boxes, not to enable you to attempt to count or check the votes yourselves, because in some instances the ballots have not been preserved as the law requires, but for such bearing as the ballot may have upon the charges of fraud, conspiracy and the mutilation and marking of ballots by employees of the county board of canvassers during the recount. Where any of such ballots have been shown to have been in the possession of any of the persons charged with such fraud, or where they have had an opportunity to mark, change or mutilate any of the ballots, such ballots are admissible solely for the bearing they have upon this branch of the case. In determining whether or not ballots were fraudulently marked, changed or mutilated you may consider the character and appearance of the ballots which have been received in evidence and offered for your inspection; the character of the

various crosses and marks; whether they appear to have been placed upon the ballots with the same pencil and under the same conditions; the character of erasures made upon the ballots and which of the candidates would be likely to have profited by any such changes. If any such changes or marks appear to have been made by the voters themselves of course they should not be considered as evidence of fraud. In considering the condition of the ballots you have a right to take into consideration the testimony of any witnesses that ballots were unlawfully marked and tampered with during the recount, and also any explanation which has been offered by the defendant which might account for any irregularities which may appear from such ballots. You should not presume that fraud was perpetrated without satisfactory proof of its existence, but, if fraud has been established, and you are satisfied that any ballots were unlawfully marked and changed during the recount, and that the recount was not fair and honest, then you may discard the results of such recount in so far as it was incorrect, and determine from all of the testimony which party received the most lawful votes at the election.''

The quoted portion of the charge conforms to the ruling made as to the admission of this evidence and amply protected appellant's rights.

The production of the poll books of the various election precincts was unsuccessfully sought. Defendant complains because the court excluded an exhibit claimed to be a résumé of the missing books.

The exhibit in question is a photostatic copy of a private document prepared by a deputy county clerk and is entitled ''number of ballots used'' by ward and district in the city of Detroit, etc.

The court properly ruled:

''The trouble is, it is simply information that this witness has compiled. Its value would depend upon a number of defenses—accuracy of his work. * * *

"I cannot receive it unless you show me some authority. There is no law requiring the clerk of the board to prepare a statement of that kind."

Neither brief contains any authority on this question and we have found none. The exclusion of this exhibit was not error.

The remaining question presented by the appeal is stated as follows:

"In a proceeding in the nature of a *quo warranto,* wherein plaintiff alleges several irregularities on the part of election officials in the conduct of a recount of votes cast in certain precincts, should not a verdict be directed against him, on motion properly made if he does not show the irregularities changed the result?"

The rule is clear and sound that an election is not to be set aside because of an irregularity unless it appears that the irregularity affected the result. *Attorney General, ex rel. Miller,* v. *Miller* (a recent *quo warranto* case), 266 Mich. 127 (106 A. L. R. 387), and authorities therein cited and quoted.

It is not only common knowledge but it also appears from the testimony of Judge Cotter in this record that the so-called "legislative inquiry," a sort of companion recount to the one under consideration, has been the subject of a grand jury investigation; a large number of persons have been convicted and their various appeals have been allowed and will be considered in due time on their merits wholly apart from any observations we shall make in the instant case.

The question propounded by appellant deserves an unequivocal answer.

We cannot acquiesce in the suggestion that appellant did not prove sufficient irregularities. The record before us contains testimony regarding many improprieties which may or may not have resulted

in actual violations of the law. We are unable to escape the conviction that the proofs disclose acts which tend to undermine the foundations of orderly government. Unless the purity of elections and the sacredness of the ballot is preserved, government as we know it and love it will perish.

The record discloses that in addition to mutilated and marked ballots, neither petitioner was able to secure a proper recount of the vote because many ballot boxes were found with their contents in such condition that they could not be counted. The employees of this board indulged in the old recount trick of breaking the seals upon the bundles of ballots as the boxes were opened so that they could not be checked. The entire procedure was a farce except for its drain upon the public purse.

Our examination of the record brings us in full accord with the answers of the jury to the special questions and the statement of the trial judge who said in answer to the suggestion that if the verdict is allowed to stand it will serve as a dangerous precedent.

"The precedent which may be established, however, is not one which should prove objectionable, but rather one which will serve as a warning at future elections, that election officials must be fair, honest and impartial in the counting of votes, and that the courts will not hesitate to correct a result obtained by unlawful methods, fraud or dishonest actions."

And the court added:

"In fairness to Probate Judge Daniel J. Healy, Jr., who constituted one member of the board of county canvassers, it should be said that there was no evidence of any misconduct whatsoever upon his part, and had the remaining members of the board followed his advice there would probably have been no necessity for this action."

We think the court might have gone still further and removed any possibility of aspersions upon counsel who participated in the recount. An examination of the record shows that counsel for both parties protested against such irregularities as they were able to observe and one of defendant's counsel went so far as to caution the board's employees in writing:

"The challengers for each of the principals in this recount having been withdrawn you must conduct your tabulations with the same degree of care that you did when they were present. Every precaution must be taken to keep this recount fair and impartial and without discrimination. Any questioned ballot must be placed aside for decision by the attorneys."

While it is not suggested that all of the employees were recklessly unfair, enough were to warrant our condemnation especially since the vigorous protests of counsel were without avail. It should also be noted that so far as is disclosed by the record neither of the candidates were in the recount rooms at any time.

The report of the county canvassing board shows that defendant received a plurality of 830 votes. The irregularities complained of and shown could easily produce a change of these and many more. There remains not the slightest doubt that plaintiff sustained the burden of proof that the irregularities changed the result.

Because of the unsatisfactory condition of the record and briefs, costs will not be ordered. Court Rule No. 5, §§ 2, 3 (1933).

The judgment of ouster is affirmed, but without costs.

NORTH, C. J., and FEAD, WIEST, BUTZEL, and SHARPE, JJ., concurred. POTTER and TOY, JJ., did not sit.