·[File No. 6471.]

THEO. B. TORKELSON, Appellant, v. M. S. BYRNE, Respondent.

(276 N. W. 134, 113 A.L.R. 1213.)

14

Opinion filed November 13, 1937.

*Paul W. Boehm* and *Theo. B. Torkelson, per se,* for appellant.

*Mark H. Amundson* and *W. C. Crawford,* for respondent.

GRONNA, Dist. J. This is an election contest. The case is here for trial de novo. At the general election held on November 3, 1936, Theo. B. Torkelson, the contestant and appellant, was a candidate for re-election to the office of state's attorney of Bowman county and M. S. Byrne, contestee and respondent, was the only opponent. Their names appeared on the no party ballots. The canvass of the official precinct returns, by the county canvassing board, showed that Byrne received 1060 votes and Torkelson 1053, or a majority of 7. The county auditor issued a certificate of election to Byrne. Torkelson instituted this contest proceeding and the district court of Bowman county found that Byrne had been elected by a majority of only one vote, namely, that Byrne had received 1043 votes and Torkelson 1042.

Torkelson's notice of contest challenges only one precinct, namely, precinct 34, comprising a part of the village of Bowman. The vote of precinct 34, as returned by the precinct board, showed that 245 votes had been cast for state's attorney, of which 150 votes were cast for Byrne and 95 for Torkelson.

■ In this precinct some of the ballots were cast without having endorsed thereon the official stamp and initials as required by § 985, Compiled Laws 1913.

Section 1006, Compiled Laws 1913, expressly provides that such ballots are void and should not be counted. Ballots which have not been endorsed as required by § 985 are void whether they be absent voters ballots or regular ballots. Weber v. O'Connell, 55 N. D. 867, 215 N. W. 539.

Section 985 requires that: "Before delivering any ballot to an elector the inspector or judge shall print on the back and near the top of the ballot with a stamp provided for that purpose, the designation 'official ballot' and the other words provided for in § 965 and also write his initials thereon."

Section 965, Compiled Laws 1913, provides that such official ballot stamp shall contain, in addition to the words "official ballot," the name and number of the precinct, the name of the county, and the date of election.

The official stamp provided for precinct 34 was in proper form and most of the ballots were endorsed with such stamp and initialed by the inspector, Robert Skare.

(Hereafter in this opinion when the phrases "endorsed ballots," or "ballots not endorsed," or the equivalent thereof are used, reference is made to ballots which have or have not been, as the case may be, endorsed with the official stamp and initials as required by § 985 prior to the time such ballots were deposited in the ballot box.)

■ After the polls were closed inspector Skare wrongfully endorsed the official stamp and his initials upon all ballots not endorsed. Of course, this belated endorsement did not make such void ballots valid. Ballots which are not endorsed by the official stamp and initials until after they have been deposited in the ballot box are void.

No formal record was kept of the number of ballots not endorsed, although inspector Skare testified he had counted 20 absent voters no party ballots which were not endorsed and that there were not more than 4 regular no party ballots not endorsed, although he had not counted such regular ballots. One of the judges of the precinct, number 34, Joseph A. Fisher, testified that although he had not counted the ballots not endorsed that in his opinion there were 16 or 18 of

the absent voters no party ballots not endorsed and 7 or 8 of the regular no party ballots not endorsed.

At this point it may be well to note that in precinct 34 there was no excess of ballots over the number of qualified electors who had cast ballots. The testimony shows that after the votes were counted the election board compared the count as disclosed by the clerk's books with the total number of ballots cast and found that the number of ballots cast was the same as the number of qualified electors who had cast ballots.

It will also be noted that this contest proceeding has arisen because of the belated endorsement of ballots not endorsed. If such void ballots had not been endorsed after the polls were closed, of course, they could have been readily identified by the absence of an official endorsement on them. By reason of such tampering the district court was presented with the problem of: (1) ascertaining the number of ballots which were not endorsed and, (2) identifying, if possible, such ballots and using the ballots in ascertaining whether they were cast for Torkelson or Byrne; (3) as to those ballots which could not be identified, the court was presented with the problem of proof, by means of secondary evidence, as to whom such ballots were cast for.

The district court correctly found that there were 25 absent voters no party ballots cast in precinct 34, of which 17 were for Byrne and 8 for Torkelson. These absent voters ballots, which were received in evidence, were yellow in color and had the words "absent voter" printed on them and thus they were easily identified and easily distinguishable from the regular ballots which were white in color.

The district court found that 20 of these absent voters no party ballots were not endorsed and correctly concluded that they were void because they were not endorsed. The remaining 5 were also found void for the following reasons.

■ The testimony of the precinct officials discloses that the last five names in the poll book are the names of absent voters who marked their no party ballots outside of the state of North Dakota. Just before the closing of the polls the election board discussed the matter of voting the ballots of these 5 absent voters. Following the discussion the inspector stamped and initialed them before they were dropped into the ballot box. The district court found, and correctly so, that

these 5 absent voters no party ballots were void because the oaths of electors, as evidenced on the envelopes containing such ballots, had not been administered by an authorized officer within the meaning of § 998, Compiled Laws 1913, such oaths having been administered outside of this State by a United States postmaster who used a postmaster's dating stamp as a seal.

Section 998, Compiled Laws 1913, provides that: "Such absent voter shall make and subscribe the said affidavit before an officer authorized by law to administer oaths and who has an official seal." A United States postmaster is not "an officer authorized by law to administer oaths" within the meaning of § 998 for two reasons, (1) because he does not have an official seal. A postmaster's dating stamp is not a legal seal within the meaning of § 998. (2) Because he is not an officer authorized to administer oaths under the provisions of § 833, Compiled Laws 1913, as amended by chapter 183, Session Laws of 1929.

With regard to this matter of what officers are authorized to administer oaths in the foreign state wherein said postmaster administered such oaths it will be presumed that the law of that state is the same as the law of this State. Chapter 213, Session Laws of 1933, provides: "That the foreign law will be presumed to be the same as the law of the State of North Dakota in the absence of rebutting evidence."

An affidavit is a written statement under oath taken before an authorized officer. (See Comp. Laws 1913, §§ 7884 and 7888.) Unless the officer has been authorized to administer the oath, the instrument does not even constitute an affidavit. 2 C. J. S. § 10, page 929. Accordingly, inasmuch as the postmaster was not authorized to administer oaths to said absent voters, their affidavits are "insufficient" within the meaning of § 1001, Compiled Laws 1913, which provides:

"In case such affidavit is found to be insufficient . . . such vote shall not be allowed, but without opening the absent voter envelope, the election inspector or a judge of such election shall mark across the face thereof, 'Rejected as defective.'"

For the foregoing reasons said 5 absent voters no party ballots were void and should not have been counted by the precinct board.

■ With respect to the regular no party ballots not endorsed, their

identity was destroyed when, after the polls were closed, inspector Skare endorsed them. Thus such ballots were no longer primary evidence as to the number of regular no party ballots not endorsed and the best evidence available was merely secondary evidence, which in this case consisted of the testimony of inspector Skare, election judge Fisher, and voters Bergeson, Brewer, and Kysar as to the number of regular no party ballots not endorsed.

The contestant, Torkelson, objects strenuously to the finding of the district court that there were only 3 of the regular no party ballots not endorsed. Torkelson contends that there were 7 or 8. The district court accepted the testimony of inspector Skare as being a correct statement of the facts. Skare testified that there were not more than 4 and Fisher testified that there were 7 or 8, although both of these witnesses testified that they had not counted such regular ballots.

It appears from the testimony given that inspector Skare was in a better position to observe the number of ballots not endorsed than was election judge Fisher, inasmuch as Skare himself had, after the polls were closed, endorsed the ballots not endorsed, whereas Fisher had merely assisted the other precinct officials in sorting out the ballots and laying before Skare the ballots not endorsed. Furthermore Skare's testimony is more positive than is Fisher's as to the number of ballots not endorsed. In the case of the absent voters ballots not endorsed Skare testified that he had actually counted 20 of them. Fisher, on the other hand, admitted that he had not counted them and merely gave his opinion that 16 or 18 of such absent voters ballots were not endorsed. As to the number of such absent voters no party ballots not endorsed the district judge accepted the testimony of Skare. This was to the advantage of Torkelson. Then as to the number of regular no party ballots not endorsed, the district court likewise accepted the testimony of Skare.

The district judge in his memorandum opinion said: "Statements of contestant's witnesses as to the number of unmarked regular no party ballots are mere guesses, and there is such a variance between their estimates as to render the contestant's proof very uncertain. . . ." Here the trial judge was referring to the testimony of witnesses Fisher and Olson. Olson was an election clerk of precinct 34. He testified that there were 5 or 6 of all kinds of ballots not endorsed

that he saw or noticed, although he did not know what part of this number was regular no party ballots which were not endorsed.

While this case is here on a trial de novo the findings of the trial judge, who saw and heard the witnesses, are entitled to appreciable weight. Hayhurst v. Hayhurst, 66 N. D. 465, 266 N. W. 653; Donovan v. Johnson, 67 N. D. 450, 274 N. W. 124.

■ Skare's testimony does not fix the number of unendorsed regular no party ballots at a definite number, it merely fixes the maximum number at 4. At the second hearing contestee, Byrne, called three witnesses, Bergeson, Brewer, and Kysar, who testified that their ballots were not endorsed. The trial court found that as to the regular no party ballots only these 3 were proved to be void. In this connection the trial court's memorandum calls attention to the rule that the burden of proof is on the contestant to prove the grounds of his contest. 20 C. J. 239, § 323.

The contestant's notice of contest alleges that void votes were cast and counted. The contestee's answer specifically denies this. Since the issue is raised by the contestant the burden of proof thereon rests upon him.

In McDonald v. Koths, 63 N. D. 716, 249 N. W. 706, it was held that the election contestant has the burden of establishing that he has received a majority of legal votes. The court said, at page 719, of 63 North Dakota: "The burden of proof is upon the contestant and it is important to determine whether he has shown that a sufficient number of these 69 ballots were double marked when canvassed by election boards, so that if rejected the contestant would have a majority of legal votes."

■ The contestant, Torkelson, emphatically objects to the testimony of three electors of precinct 34—Bergeson, Brewer, and Kysar, who testified that the no party ballots cast by them were not endorsed and they had voted for Torkelson. Without any objection on their part these three electors testified that the regular no party ballots cast by them were not endorsed. Electors Bergeson and Kysar, without any objection on their part, testified that they had cast their ballots for Torkelson. Elector Brewer, however, objected to testifying as to whom he had voted for, claiming the privilege of the secret ballot. His

objection was overruled and his claim of privilege denied. Whereupon Brewer testified that he had voted for Torkelson.

The contestant Torkelson insists that a voter should not be permitted to testify as to the person for whom he has voted at an election. Contestant contends that the constitutional provision that "All elections by the people shall be by secret ballot, . . ." (N. D. Const. § 129) was not simply intended as a security to the elector for the free and independent exercise of the right of suffrage but that from considerations of public policy it should be held to prevent the voter, under any circumstances, from disclosing before a judicial tribunal how he voted. But this point was overruled by the district court. This court affirms that ruling on the ground that while a voter has the privilege of preserving the secrecy of his ballot by refusing to testify as to its contents, he is at liberty to waive that privilege. While it is axiomatic that a qualified elector cannot be compelled to disclose for whom he voted, it is also true that this privilege of secrecy is entirely a personal one, and a voter himself may waive his privilege and testify for whom he voted. Thus, in the case at bar, the electors, Bergeson and Kysar, having waived their personal privilege of secrecy, were properly permitted to testify as to whom their respective ballots were cast for.

A qualified elector is not to be branded as an unqualified or illegal voter and is not to be shorn of his privilege of secrecy merely because an election inspector has neglected to endorse the ballot cast by such elector. The adjectives "unqualified" and "illegal" refer to the condition or status of the elector himself at the time he cast his ballot rather than to the ballot itself. While the omission to endorse the ballot renders the vote void "This is an omission that the voter is in no wise responsible for." Grubb v. Dewing, 48 N. D. 774, at page 778, 187 N. W. 157. Thus, in the case at bar, the district court erroneously denied elector Brewer's claim of privilege.

■ However, such error cannot be raised by Torkelson. He cannot take advantage of such error inasmuch as the privilege is purely personal to the elector. Neither party to the contest has a right to the exclusion of such evidence on the ground that such evidence violated the electors' privilege of secrecy.

Inasmuch as the elector Brewer is not a party to this proceeding we

are only incidentally concerned with the essential principle of the elective system which clothes all qualified electors with the privilege of secrecy. In this proceeding we are primarily concerned with the ascertainment of the truth as to the number of legal votes cast for the parties to the contest.

Robinson v. McAbee (1923) 64 Cal. App. 709, 222 P. 871, involved an election contest wherein it was held that the trial court's action in compelling a witness, not qualified to vote and not a party to the contest, to state for whom she voted as against her objection that her testimony would tend to incriminate her, was not prejudicial to contestee's rights, and could not be availed of by him. At page 713 of 64 Cal. App., page 873 of 222 Pac., the California court said: "Whether the court's action in compelling her to testify involved a violation of her right to refuse to testify on the ground stated is a matter which can in no manner concern the contestee or which could have operated prejudicially against his rights in the trial of the contest."

Robinson v. McAbee, supra, was cited with approval in Orum v. State (1923) 38 Ohio App. 171, 175 N. E. 876, a criminal action wherein it was held that the defendant cannot complain of the court's error in requiring the witness to answer a question tending to incriminate, even though the testimony tended to prove the defendant guilty of the crime charged. The Ohio court said:

"Not only has the defendant no right to require the court to instruct the witness regarding his legal rights, but, if the witness claims the privilege of refusing to answer a question on the ground that his answer would tend to incriminate him, and the court disregards the request, and requires the witness to answer, the defendant has no right to object, and it is not reversible error in the reviewing court, even if the trial court erred in requiring the witness to answer, and the error tends to prove the defendant guilty of the crime charged.

" 'The privilege of refusing to answer is personal to the witness, and is not in any sense the privilege of the party calling him. Mr. Chief Justice Nelson, in Cloyes v. Thayer, 3 Hill, 564, says: "If ordered to testify in a case where he is privileged, it is a matter exclusively between the Court and the witness. The latter may stand out and be committed for contempt, or he may submit; but the party

has no right to interfere or complain of the error." '   Clark v. Reese, 35 Cal. 89, 95.

"This question was before the federal Circuit Court of Appeals. That court referring to the rights of a party, said:

" 'The party to the suit has no right to insist upon it, except when he is himself the witness.   And if the witness waives his privilege, or the court disregards it, and requires him to answer, the party has no right to interfere or complain of the error.'   Morgan v. Halberstadt (C. C. A. 2d) 60 F. 592, 596.

"See also State v. Cobley, 128 Iowa, 114, 103 N. W. 99; Ingersol v. McWille, 87 Tex. 647, 30 S. W. 869; State v. Van Winkle, 80 Iowa, 15, 45 N. W. 388; Samuel v. People, 164 Ill. 379, 45 N. E. 728; Beauvoir Club v. State, 148 Ala. 643, 42 So. 1040, 121 Am. St. Rep. 82; Robinson v. McAbee, 64 Cal. App. 709, 222 P. 871; State v. Crisinger, 197 Iowa, 613, 195 N. W. 998; State v. Rowley, 198 Iowa, 613, 198 N. W. 37, 39, 199 N. W. 369.

"The Supreme Court of Iowa said in this last case, in the opinion:

" 'It is further urged that the court erred in compelling the prosecuting witness, Wilma Kirby, to testify over her objection that the testimony solicited tended to incriminate her.   The testimony of this witness was clearly competent, and therefore admissible as against the defendant.   If the privilege to the witness was denied wrongfully, the wrong was to the witness, and not to this defendant.' "

Orum v. State, 38 Ohio App. 171, 175 N. E. 876, supra, also cites with approval the leading case of Samuel v. People, 164 Ill. 379, 45 N. E. 728, wherein a witness was erroneously compelled to testify, in spite of his claim of privilege, on the ground that his evidence tended to incriminate him.   Held, that this is not ground for exception. Samuel v. People, supra, a criminal action, is cited with approval in State v. Wilkins (1930) 156 Wash. 456, 287 P. 23, wherein the defendant was convicted of first degree murder, which conviction was affirmed. The Washington court refers to Samuel v. People, supra, as one of the leading cases on this matter and quotes extensively from such case, including the following statement appearing at page 386 of 164 Ill., page 730 of 45 N. E. "As the privilege is personal to the witness, he may waive it, and elect to testify. . . . This being so, the evidence

is equally good where the witness, instead of giving it voluntarily, is compelled to give it."

In 4 Wigmore on Evidence, 2d ed. § 2196, at page 660, the above view is supported thus: "(2) (a) An *improper ruling* by the Court, upon a question of privilege, *cannol be excepted to by the party* as an error justifying an appeal and a new trial, if the ruling *denies the privilege* and compels the witness to testify. By hypothesis, the privilege does not exist for the benefit of the party nor for the sake of the better ascertainment of the truth of his cause. The offered testimony is relevant, and is, in all other respects than the privilege, admissible. The admission of it, by denying the privilege, has not introduced material which in any way renders less trustworthy the finding of the verdict; on the contrary, only the exclusion of it could have been an obstacle to the ascertainment of the truth. The only interest injured is that of the witness himself, who has been forced to comply with a supposed duty, which as between himself and the State did not exist; his remedy was to refuse to obey, and to appeal for vindication if the Court had attempted improperly to use compulsory process of contempt."

■ Did the district court err in permitting said three electors to testify that their ballots were not endorsed? Was such testimony rendered inadmissible by the provisions of § 1042, Compiled Laws 1913, prohibiting a voter from identifying his ballot by marking or showing his ballot so as to reveal the contents thereof? Referring to such a statute as 1042, we find the following statement in 9 R. C. L. p. 1047: "So careful have legislatures become in providing for secrecy that the voter is frequently prohibited from in any way marking his ballot for the purpose of subsequent identification."

Section 1042 prohibits a voter from identifying his ballot and revealing its contents at the time he casts such ballot. Accordingly, § 1042 is inapplicable here and the provisions thereof do not render inadmissible the testimony of said three electors to the effect that their ballots were not endorsed. The provisions of § 1042 do not render such testimony inadmissible for the further reason that such testimony in itself does not identify the voter's ballot or reveal the contents thereof.

■ As stated above, the regular no party ballots not endorsed were

not available as primary evidence and accordingly secondary evidence was resorted to. The testimony of said three electors was admissible as secondary evidence under the best evidence rule. While the original ballots are the best evidence when their identity has been established, if such identity cannot be established the ballots lose their character as primary evidence and then secondary evidence is admissible. In such a case the testimony of the voter is admissible as to, (1) whether or not his ballot was endorsed, and (2) if not, for whom he cast such void ballot.

The contestant, Torkelson, objects to the testimony of the three electors, Bergeson, Brewer, and Kysar, that they had voted for Torkelson on the further ground that such testimony was received at the second hearing of this proceeding after it had been remanded by this court. This testimony was, of course, within the issues raised by the notice of contest and answer. The first hearing in the district court was held December 10, 1936 and the contestant, Torkelson, appealed from an adverse judgment. This court, having heard the arguments of the parties, issued an order on March 13, 1937, remanding the case to the district court with directions that further proceedings be had. (Sess. Laws 1927, chap. 214.) Accordingly, on April 20, 1937, the district court heard further testimony, including the testimony of said three electors as to whom they had voted for. It was at the first hearing that inspector Skare testified that there were not more than 4 regular no party ballots not endorsed and such testimony was within the issues of this contest. In particular this objection of the contestant is based on his construction of said remanding order. The contestant construes it as remanding the case for the sole purpose of producing and examining the absent voters ballots, which were not received in evidence until the second hearing. However, the terms of this court's remanding order specifically provide: "That both parties be afforded opportunity to offer such additional evidence as they may desire tending to show for whom the several invalid ballots in election precinct No. 34 in Bowman County were cast and counted for the office of State's Attorney."

As shown above the testimony of the three electors at the second hearing as to whom they had voted for concerned regular no party ballots shown to be invalid by the testimony of inspector Skare at the

first hearing. Accordingly such testimony of said three electors was properly received pursuant to the provisions of the above quoted remanding order.

█ Several days after the second hearing had on April 20 the contestant Torkelson moved the district court for an order to reopen the case for the sole purpose of cross examining the witness Kysar for impeachment purposes only. The district court properly denied such motion to reopen.

At such second hearing the contestee, Byrne, called the elector Kysar as a witness. Kysar testified that his ballot was not endorsed when the same was cast. Kysar also testified, over the contestant's objection, that he voted for the contestant Torkelson. The application to reopen alleges that the contestee was the attorney for an estate in which the witness Kysar was the sole heir. This allegation was supported by the affidavits of Torkelson and the county judge. At the second hearing the contestant did not ask Kysar whether or not Byrne was his attorney.

Torkelson's affidavit in support of his motion to reopen also recites that he, Torkelson, has been informed that since the second hearing the witness Kysar has "made remarks in the hearing of a number of persons which would strongly tend to indicate that he did not, in fact, vote for the contestant, Torkelson, for the office of State's Attorney, at the said election, but did vote for the contestee, M. S. Byrne. . . ."

Torkelson's affidavit failed to disclose what the remarks were, who had made them, to whom they were made, or the materiality of the remarks as proper impeachment evidence. Torkelson's statement concerning such recitations are hearsay. Such affidavit did not specify what witnesses or evidence Torkelson would offer; there was no disclosure as to the availability or substance of the evidence sought to be introduced. The affidavit did not disclose whether the probative effect of the alleged remarks of third persons was such as to render a different result probable in the event the motion to reopen was granted.

"When it is permissible to make an affidavit on information and belief, the source of the information and the grounds of the belief must be stated so that the court will have sufficient information to draw its own conclusions therefrom." 2 C. J. S., Affidavits, § 26, p. 982; 1 Am. Jur., Affidavits, §§ 22 and 24, pp. 948 and 951.

"Averments which merely state opinions or legal conclusions or characterizations, speculations, and inferences, instead of facts are insufficient." 2 C. J. S., Affidavits, § 16b, p. 952.

"The principal test of the sufficiency of an affidavit is whether it is so clear and certain that an indictment for perjury could be predicated thereon if it were false." 2 C. J. S., Affidavits, § 18, p. 955.

A motion to reopen a case for the purpose of cross-examining a witness for impeachment purposes only is addressed to the sound judicial discretion of the trial court and that court's ruling thereon will not be disturbed in the absence of a manifest abuse of such discretion.

In the American Digest, Third Decennial ed. under the subject "Trial," key number 68, subtitle "Reopening case for further evidence after close of evidence" the following general statement appears:

"The reopening of a case after the close of the evidence rests in the discretion of the trial court."

"A motion to reopen a case for the purpose of introducing further evidence in the cause is addressed to the sound discretion of the court, the exercise of which is not subject to review, unless there has been an abuse thereof. . . . While the exercise of the court's discretion should not be hampered by unreasonable conditions, such discretion is judicial and not arbitrary." 64 C. J. 158, § 179.

In Michner v. Ford, 78 Kan. 837, 98 P. 273, it was held that where the district court, after trial of a case without a jury, takes it under advisement, and a party on the next day applies to introduce further testimony, the court may, in its discretion, refuse to reopen the case for the reason that the evidence should have been presented at the proper time.

In Michner v. Ford, supra, the Supreme Court of Kansas said, at page 840, of 78 Kan., page 274 of 98 Pac.: ". . . the court based its refusal solely upon the ground that the evidence should have been presented at the proper time. This action of the court is claimed to be erroneous. We are unable to concur in this conclusion. . . . Courts must be left free to control the conduct of the business before them, and the charge of abuse of discretion cannot be sustained unless clearly shown. We cannot say that it is improper for a trial court to require trials to be finished when the parties rest and submit the case."

In the case at bar, in denying such motion to reopen, the memoran-

dum of the district court further calls attention to the fact that "there have been two hearings and both parties have had opportunity to submit all their facts." It was discretionary with the trial court whether or not to permit the recall of the witness Kysar for cross-examination for impeachment purposes only and there has been no breach of discretion on the part of the trial court in denying the motion to reopen for such purpose.

■ The contestant, Torkelson, called inspector Skare as a witness at the first hearing and on direct examination such witness testified that there were 20 absent voters no party ballots not endorsed. The contestant contends that it was improper cross-examination to ask this witness as to the number of regular no party ballots not endorsed inasmuch as the witness was not questioned on direct examination as to such ballots. This contention on the part of the contestant may be disposed of on the simple ground that the contestant failed to object to such cross-examination.

"An objection . . . that the cross-examination of a witness exceeded its proper scope cannot be raised for the first time on appeal. . . ." 70 C. J. 681, note 45.

■ As stated above Torkelson's notice of contest challenges only one precinct, the 34th. The gist of the notice of contest is that the entire vote of this precinct should be thrown out as void for the reason that an indefinite number of the ballots not endorsed were endorsed after the polls were closed; that in this manner the precinct board fraudulently and corruptly altered void ballots so as to make them appear to be legal and intermingled them with the valid ballots so as to render them indistinguishable therefrom and counted the votes cast thereby, to the effect of rendering the result of the election uncertain and incapable of ascertainment as between the parties to this contest.

There has been a failure of proof of this allegation inasmuch as it affirmatively appears that the number of ballots not endorsed are definite rather than indefinite and that the result of the unlawful act of endorsing ballots after the polls are closed would not render the result of the election uncertain and incapable of ascertainment as between the parties to this election. On the contrary the district court found, and correctly so, that the precinct board received and counted 28 void ballots, 25 of which were absent voters no party ballots and

the other 3 regular no party ballots. Of the 25 absent voters no party ballots, all void, 17 of them had been cast for Byrne and 8 for Torkelson. The 3 void regular no party ballots were cast for Torkelson. Thus Byrne retains a majority of one vote.

"The rule is clear and sound that an election is not to be set aside because of an irregularity unless it appears that the irregularity affected the result." Behrendt v. Wilcox, 277 Mich. 232, 269 N. W. 155 at page 161.

There is no statutory provision which excludes the entire vote of precinct 34 or which makes the election therein void. Section 1006, Compiled Laws 1913 does not so provide. Section 1006 declares void only such ballots as have not been endorsed.

"There is no provision in the statute which excludes the vote of the precinct or says the election therein shall be void. . . . The primary object of an election is to enable the voters of the precinct to express their choice of candidates. They ought not to be deprived of the right to express that choice by the fault or neglect of election officials. The authorities all recognize that fraud upon the part of the voter vitiates his ballot, but fraud or mistake on the part of the inspectors of election should not operate to defeat the will of the voter." Atty. Gen. ex rel. Miller v. Miller, 266 Mich. 127, 253 N. W. 241, at page 243, 106 A.L.R. 387.

The judgment of the district court is affirmed.

NUESSLE, BURR, and MORRIS, JJ., concur.

CHRISTIANSON, Ch. J. (dissenting in part). I agree with the principles stated in paragraphs 1, 2, 3, 4, 5, 10, 11 and 12 of the Syllabus and with those portions of the majority opinion relating to the matters to which such paragraphs of the syllabus relate. I also agree with the principle stated in paragraph 6 of the syllabus, that "a qualified elector cannot be compelled to disclose for whom he voted." But I dissent from the holding of the majority to the effect that where a qualified elector, who is called as a witness, objects to being required to testify as to whom he voted for, on the ground that the laws providing for a secret ballot grant to a voter the right to refrain from giving such testimony, and the trial court erroneously overrules the objection of

the witness and compels him to testify, such testimony becomes competent legal evidence properly to be considered in the disposition of the case. It is my view that when a qualified voter objects to giving testimony as to whom he voted for on the ground that the ballot is secret and that an elector cannot be compelled to testify as to how he voted on any proposition or for any person, testimony elicited over such objection is illegal, and on grounds of public policy should not be considered for any purpose whatsoever.

This is not a case where an elector voluntarily testifies as to how he voted. As said, in the majority opinion "elector Brewer, however, objected to testifying as to whom he had voted for, claiming the privilege of the secret ballot. His objection was overruled and his claim of privilege denied."

The record also discloses that immediately following Brewer's objection to being required to testify for whom he had voted, contestant's attorney said: "We object to this question on the ground it is violating the secrecy of the ballot. This voter has not been shown to be an illegal voter and he cannot be compelled to disclose the way he voted under the Australian ballot and we object to the question for the reason it violates that right and is incompetent, irrelevant and immaterial."

The objections of Brewer and of contestant's attorney were overruled and Brewer was required to testify. As I understand it, all the members of the court are agreed that the trial court was in error in requiring Brewer to testify; but it is said that that is a matter which concerns Brewer alone and that, consequently, the fact that the trial court erred in its ruling is of no consequence in determining the issues in this case.

The constitution of this state expressly provides that "all elections by the people shall be by secret ballot." N. D. Const. § 129. The debates of the constitutional convention disclose no opposition on the part of any of the delegates to this provision. Shortly after the constitutional convention had convened the Governor of the then Territory of Dakota was invited to address the convention. Debates Constitutional Convention North Dakota, pp. 44–47. In the course of his address he said: "There is one question which in my mind should receive special attention, and that is the question of securing the purity

of the franchise. . . . There is one point on which we are all agreed, and that is that the ballot of America needs purification, and unless it is purified this great government on which it rests will sink away in the near future, and we shall cease to be a self-governing nation. I do not pretend to say to you, gentlemen, what the necessary and proper requisites of safety are that should be drawn around the ballot box, but there is one fact to which we cannot shut our eyes—and that is that the world moves forward. There have been important advances made in this department of experience of legislative wisdom, and in my judgment what this country will have to adopt will be the secret ballot. . . . It has been suggested in one of the public prints of your state, recently, that the cost of this new system of voting is more than you can afford—that it will cost several thousands of dollars extra to adopt the system of secret voting that has been adopted by some other countries and found satisfactory. In my judgment the purity of the ballot cannot be obtained at too high a price. You cannot pay too much for it. If in your judgment you can by this method place restraint about the ballot which will make it more sacred, which will preserve it in its purity, you should not stop to count the cost, for the purity of the ballot is everything to this country."

Early in the history of the state the legislative assembly proceeded to carry into effect the constitutional mandate for a secret ballot. Laws 1891, chap. 66, § 34. They provided, among other things, that "no person shall show his ballot, after it is marked, to any person in such a way as to reveal the contents thereof or the name of any person for whom he has marked his vote nor shall any person solicit the elector to show the same; nor shall any person, except a judge of election, receive from any elector a ballot prepared for voting." They also provided that "no elector shall vote or offer to vote any ballot except such as he has received from an inspector or a judge of election having charge of the ballots;" and that "no elector shall place any mark upon his ballot by which it may afterwards be identified as the one voted by him." They further provided that whoever commits any of the prohibited acts is guilty of a misdemeanor and subject to punishment. Laws 1891, chap. 66, § 34; Comp. Laws 1913, § 1042. These provisions have remained in force since their enactment.

No case has been cited and none has been found which makes it

proper or lawful under constitutional and statutory provisions such as those in force in this state to compel an elector to disclose as to how he voted either as regards candidates for office or upon any proposition submitted at an election. Indeed the majority members hold that the testimony of Brewer was elicited contrary to the laws of the state. But they say the rights violated by requiring Brewer to testify were the individual and personal rights of Brewer; that he is the only person affected by the erroneous ruling, and, consequently, he alone may be heard to say that it was erroneous. None of the authorities cited in the majority opinion cover the specific question involved here. In the authorities there cited the witness objected to testifying on the ground that the answer might incriminate the witness. In no case was a situation presented like the one presented here, where a legal elector objects to being required to disclose how he voted on the ground that this would be violative of the provisions of law safeguarding the secrecy of the ballot. In my opinion there is a striking difference between the privilege afforded to a witness to refrain from answering a question on the ground that the answer might incriminate the witness, and the inhibition against any elector being compelled to disclose how he voted.

The provision against self-incrimination is for the benefit and protection of the witness; provisions for the secrecy of the ballot are not so much for the protection of the individual as for the protection of the state. The underlying purpose of the provisions preserving the secrecy of the ballot of a legal elector goes far beyond the protection of the individual elector from any detriment he may suffer if his ballot were made public. The fundamental purpose of such provision is to protect the institutions of free government themselves. This was recognized by the Governor of the Territory of Dakota in urging the delegates to the constitutional convention to place in the constitution of the state a provision for a secret ballot and thus preserve the integrity of the franchise. This has also been recognized by the courts and leading legal writers who have discussed the subject.

In his great work on Constitutional Law, Judge Cooley (Cooley, Const. Lim. 7th ed. pp. 910–913) said:

"The mode of voting in this country, at all general elections, is almost universally by ballot. . . . The distinguishing feature of

this mode of voting is, that every voter is thus enabled to secure and preserve the most complete and inviolable secrecy in regard to the persons for whom he votes, and thus escape the influences which, under the system of oral suffrages, may be brought to bear upon him with a view to overbear and intimidate, and thus prevent the real expression of public sentiment. . . .

"The system of ballot-voting rests upon the idea that every elector is to be entirely at liberty to vote for whom he pleases and with what party he pleases, and that *no one is to have the right, or be in position, to question his independent action, either then or at any subsequent time.* The courts have held that a voter, even in case of a contested election, cannot be compelled to disclose for whom he voted; and for the same reason we think others who may accidentally, or by trick or artifice, have acquired knowledge on the subject should not be allowed to testify to such knowledge, or to give any information in the courts upon the subject. *Public policy requires that the veil of secrecy should be impenetrable, unless the voter himself voluntarily determines to lift it; his ballot is absolutely privileged;* and to allow evidence of its contents when he has not waived the privilege is to encourage trickery and fraud, and would in effect establish this remarkable anomaly, that, while the law from motives of public policy establishes the secret ballot with a view to conceal the elector's action, it at the same time encourages a system of espionage, by means of which the veil of secrecy may be penetrated and the voter's action disclosed to the public."

Wigmore (4 Wigmore Ev. 2d ed. § 2214) says:

"In general, there is no need of a privilege against the disclosure of political *opinion,* because it is not for the interest of the community that such beliefs should remain secret. . . .

"But the secrecy of his *vote* is a different thing. The community's interest is that the citizen's vote, the culminating act by which his opinion is made most effective, should be absolutely sincere, i. e., should represent accurately his opinion upon the persons or the propositions presented for choice. At the time of voting, especial danger exists that influences of oppression will prevail to coerce the elector into an insincere vote. This danger affects the welfare of the State itself, as dependent upon freedom of political action. While, therefore, there

may be no warrant for sanctioning secrecy of political opinion as such, there is a need for securing secrecy of voting, in order that the vote may correctly represent the opinion. In short, the danger that the citizen himself may incur enmity or other detriment by the compulsory disclosure of his true opinion, at ordinary times or in court, is not to be regarded as worth attention; but the danger to the State, of obtaining a false index of his opinion, at the crucial moment of voting, is decidedly to be guarded against. The main expedient for this purpose is to provide such apparatus at the polls as secures permissive, and, under modern systems, compulsory secrecy. *But this expedient would be deficient if also the privilege were not conceded of being silent ever afterwards as to the tenor of the vote. Thus it is that the privilege of not disclosing, in a court of justice, a formal act of expression of the witness' political opinion done at a prior time comes to be recognized as a corollary of the secrecy of the ballot.*

"That a privilege exists not to disclose by the witness' own testimony the *tenor of his vote,* has not been doubted, either under the earlier American system of permissive secrecy at the polls or under the modern Australian system of compulsory secrecy."

In this case the voter did not give his testimony voluntarily. He specifically invoked the constitutional and statutory provisions safeguarding the secrecy of the ballot. Counsel for the party against whom the evidence was sought to be adduced, also, objected to its admission. All members of the court are agreed that the testimony should not have been admitted; that its admission was in contravention of the laws of the state. The majority members, however, say it is true the testimony should not have been admitted and its admission was in contravention of the laws of the state; but, they say, the erroneous ruling affected only rights guaranteed to the witness Brewer and this being so the contestant may not be heard to say that the testimony should not be considered. So we have this situation: a party to a controversy pending in court is permitted to obtain the full benefit of testimony that is elicited, and a witness is required to give, in contravention of provisions of law,—provisions enacted for the protection of the state itself. If this may be done, then what Judge Cooley, in the above quoted statement, says is prohibited on the grounds of public policy may nevertheless be done. Under the rule announced by the

majority, any litigant may call an elector as a witness and propound to him questions which the majority members all agree no elector can lawfully be compelled to answer, and in the event the trial court sees fit to permit the question to be asked, the witness must either answer or subject himself to punishment for contempt; and if he answers under such compulsion, the testimony so given, notwithstanding the fact that it was elicited in contravention of law, becomes competent, legal evidence and must be considered as such in the disposition of the case. Under the rule announced by the majority it is difficult to see how there can be any protection of the secrecy of the ballot in a case where by trick, artifice, espionage or oppression, knowledge has been acquired as to how an elector voted. In such case the elector may not be present at the time the evidence is offered, yet under the rule announced by the majority, an objection by the litigant is unavailing and if the trial court sees fit to admit the evidence, then, without regard to the fact that it was elicited in violation of positive pronouncements of our law and infringed a privilege which the majority members say that an elector has, such testimony would be of precisely the same validity and effect as though no inhibition against the elicitation of the testimony existed. In other words, under the rule announced by the majority, testimony which the laws of the state say shall not be elicited becomes effective for every purpose, and the rights, not only of individuals but of the public, may be determined solely on the basis of such illegal evidence.

With all due deference to the views of my associates, I cannot and will not subscribe to a doctrine that, in my judgment, is so subversive of the fundamental principles of public policy that underlie our constitutional and statutory provisions intended to secure inviolable the secrecy of the ballot. Under the laws of North Dakota it is clearly beyond the power of any officer or of any department of government, executive, legislative or judicial, to require an elector ever to disclose how he voted at an election.

Our laws evidence an intention on the part of the lawmakers to so provide that each elector may go to the polls and cast his ballot with the assurance that unless the laws are violated no other human being will ever know how he votes, unless he, subsequently, sees fit to disclose it. The great rule of statutory construction is to ascertain and give

effect to the intention of the lawmakers. The laws relating to the secrecy of the ballot should be given effect and vitality. They should be so construed and applied as to make real the purpose they were intended to accomplish.