Norma KUHN, Petitioner,

v.

William BEEDE, Judge of the Ward County District Court, et al., Respondents.

Civ. No. 9298.

Supreme Court of North Dakota.

Dec. 31, 1976.

Jonathan C. Eaton, Jr. and Nevin Van de Streek, Eaton and Van de Streek, Minot, for petitioner Kuhn; argued by Nevin Van de Streek, Minot.

Mitchell Mahoney and Thomas A. Wentz, Pringle & Herigstad, P. C., Minot, for respondent Wentz; argued by Mitchell Mahoney and Thomas A. Wentz, Minot.

Orlin W. Backes, McGee, Hankla, Backes & Wheeler, Minot, for intervenors; argued by Orlin W. Backes, Minot.

Atty. Gen. Allen I. Olson, Bismarck, for respondent, Secretary of State Ben Meier.

PAULSON, Judge (on reassignment).

This is a petition for review of the Ward County District Court's decision which rejected certain absent voters' ballots cast in a state legislative contest. Such decision was made by the district judge in the course of conducting a ballot recount for the office of State Representative from the 41st Legislative District on November 26, 1976, pursuant to § 16–01–10(3), N.D.C.C.

The parties concede that this court has personal jurisdiction of the parties.

█ This court has jurisdiction to hear the subject matter, pursuant to § 16–01–10(3), N.D.C.C., wherein it is provided that

"*Correcting errors on ballots—Requiring performance of duty or desistance from wrongful performance.*—Whenever it shall be made to appear by an affidavit to the supreme court, or to the district court of the proper county that:

.     .     .     .     .

"3. Any wrongful act has been or is about to be done by any judge or

clerk of election, county auditor, canvassing board, member thereof, or other person charged with any duty concerning the election

.     .     .

.     .     .     .     .

a judge of such court shall order the officer or person charged with such error, wrong, or neglect to correct the error, desist from the wrongful act, perform the duty, or show cause at a time and place to be fixed by the court why he should not do so.   .   .   ."

Such specific grant of jurisdiction is in addition to the Supreme Court's original jurisdiction granted by § 86 of the North Dakota Constitution, as amended at the primary election on September 7, 1976.   See 32 N.D. L.Rev. 199, 204 (1956), and cases cited therein.

This matter arises out of the same factual situation as in *State ex rel. Olson v. Thompson* N.D., 1976, 248 N.W.2d 347 wherein we stated:

"This matter arose following the November 2, 1976, general election.   The county auditor of Ward County forwarded to the Secretary of State the certified abstract of votes required by law, including that of State Representative from the 41st District as follows:

| | |
|---|---|
| Walsh. | 2,402 |
| Forsberg | 1,928 |
| Wentz. | 2,283 |
| Kuhn | 2,291 |

Subsequent to the receipt of such certification, the Secretary of State was served with a copy of a Demand for Recount by Janet Wentz, pursuant to § 16–13–47.1, N.D.C.C., as amended.   .   .   .

"Within fifteen days after the Demand for Recount was filed by Wentz, the Secretary of State received the results of the recount conducted pursuant to § 16–13–47.1, N.D.C.C., as amended, certified by the Honorable William M. Beede, District Judge of Ward County, which indicated the following:

Kuhn . . . . . . . . . . 2,205
Wentz. . . . . . . . . . 2,206
Walsh. . . . . . . . . . 2,311
Forsberg . . . . . . . . 1,850 "

In the present proceeding, this court is asked to review the decision of the district court which declared void and did not count 202 absent voters' ballots which were not endorsed with the official stamp and initialed pursuant to §§ 16–12–04, 16–18–17, and 16–13–01, N.D.C.C. We are further requested to determine, in the event this court approves the decision of the district court, whether or not the constitutional rights of the 202 absentee voters were violated by the district court's action in voiding their absent voters' ballots.

Section 16–12–04, N.D.C.C. provides:

"*Delivering ballot to elector—Stamping.*—The inspector or one of the judges of election shall deliver ballots to the qualified electors and at primary elections only, shall inform each elector that if he splits his ballot or votes for candidates of more than one party his ballot will be rejected. Before delivering any ballot to an elector, the inspector or judge shall stamp once at the top of the back of the ballot the designation 'official ballot' and the other words provided for in section 16–11–11, and also shall write his initials thereon. Failure to stamp and initial a ballot in the proper place on the ballot shall not invalidate such ballot but a failure to stamp and initial a ballot at any place on a ballot shall invalidate the ballot."

Such stamping and initialing requirement is made applicable to absent voters' ballots under § 16–18–17, N.D.C.C., which, after instructing the inspector of elections or the judges of elections to open the outer envelope and compare the signatures, then provides, in pertinent part:

". . . If the judges find that the statement is sufficient and that the signatures correspond, and that the applicant is then a duly qualified elector of such precinct and has not voted at such election, they shall open the absent voter's envelope in such manner as not to destroy the statement thereon. They shall take out the ballot or ballots contained therein without unfolding the same, or permitting the same to be opened or examined, *and after endorsing the same as other ballots are endorsed,* they shall deposit the ballot in the proper ballot box and show by the records of such election that such elector has voted. . . ." [Emphasis added.]

The effect of a failure to stamp and initial a ballot is specified in § 16–13–01(1), N.D.C.C., which provides, in pertinent part:

"*Ballots void and not counted—Part of ballot may be counted.*—In the canvass of the votes at any election, a *ballot shall be void and shall not be counted* if:

"1. It is not endorsed with the official stamp and initials as provided in this title [Title 16] . . ." [Emphasis added.]

The district court construed such statutory provisions to be mandatory, ruling that all ballots not so stamped and initialed are void and are not to be counted. Such ruling by the district court resulted in the voiding of 202 absent voters' ballots and is the subject of this review. It is noted that absent voters' ballots cast in five of the seven precincts comprising the 41st Legislative District were properly stamped and initialed. All of the absent voters' ballots voided were cast in precincts which used voting machines for those electors who voted in person.

The petitioner contends that North Dakota statutes do not require stamping and initialing of absent voters' ballots which are cast on voting machines. Petitioner contends that such requirement is applicable only to absent voters' ballots cast in precincts using ballot box voting, but is not applicable to absent voters' ballots cast in precincts using voting machines. Petitioner cites § 16–18–20, N.D.C.C., as authority for her contention, indicating that § 16–18–20 is the only statute which specifically refers to the casting of absent voters' ballots in

precincts using voting machines. Section 16–18–20, N.D.C.C., provides:

> "*Registration of absent voters' ballots on voting machines.*—Absent voters' ballots, if any, shall be registered on the voting machines by two election officials of opposed interests, if such there be, otherwise by any two election officials. The voting of absent voters' ballots on the voting machines shall be done in secrecy by the two election officials during the voting day at such intervals as are available when machines are not in use by voters."

Petitioner further contends, because § 16–18–20, N.D.C.C., contains no reference to the endorsement of absent voters' ballots, it is presumed that the legislature did not intend that the endorsement requirement be applicable to absent voters' ballots cast in precincts using voting machines. We disagree.

If this court were to accept petitioner's contention that the procedural requirements set forth in § 16–18–17, N.D.C.C., but not included in § 16–18–20, N.D.C.C., are not applicable to absent voters' ballots cast in precincts using voting machines, it would follow that most of the procedural safeguards the legislature employs to assure the integrity of the election process in the casting and counting of absent voters' ballots in precincts using voting machines would be circumvented. Section 16–18–20, N.D.C.C., does not provide for a comparison of an absent voter's signature on the outer envelope of such ballot with the absent voter's signature on his application for an absent voter's ballot; it does not require a determination that the absent voter be a duly qualified elector of such precinct; it does not require a determination that the absent voter has not voted at such election; it does not require an examination of the absent voter's ballot; it does not require the election officials to enter in the records of such election the fact that such elector has voted; it does not provide a procedure for preserving absent voters' ballots which are found to be defective; and it does not require that the absent voters' ballots be endorsed.

■ We find that the legislature, in enacting § 16–18–20, N.D.C.C., intended only to establish a procedure whereby absent voters' ballots could be effectively counted in those precincts using voting machines, and that the legislature did not intend to eliminate the procedural safeguards already provided to protect the integrity of the election process in the casting and counting of absent voters' ballots. Such interpretation gives effect to both § 16–18–17 and § 16–18–20, N.D.C.C. § 1–02–07, N.D.C.C.

■ Next, it is contended that, even if the endorsement requirement is applicable to absent voters' ballots cast in precincts using voting machines, such requirement should be found to be directory and not mandatory. Such issue was raised in *Weber v. O'Connell*, 55 N.D. 867, 215 N.W. 539, 540–541 (1927), wherein this court held:

> "*This court has consistently held that the requirements of section 985 [§ 16–12–04, N.D.C.C.] as to indorsements by the official stamp and initials, construed in the light of section 1006 [§ 16–13–01, N.D.C.C.], are mandatory and that ballots not so indorsed by both stamp and initials are void and shall not be counted.* [Citations omitted.] [Emphasis added.]

> .    .    .    .    .

> "The defendant in this behalf contends, and this was the view taken by the trial court, that the absent voters' statute was an innovation in the law and was enacted long subsequent to the enactment of sections 985 and 1006 [§§ 16–12–04 and 16–13–01, N.D.C.C.]; that the Legislature, when it enacted the latter sections, had no intention that such section should apply to absent voters' ballots, and that when the Legislature in 1913 enacted the absent voters' statute, it clearly did not contemplate that the provision for the indorsement of absent voters' ballots should be mandatory; that the reasons for the enactment of section 1006 [§ 16–13–01] do not exist in the case of absent voters' ballots, and the reasons not existing, this statute was not intended to apply. On the other hand, the plaintiff contends that applying the ordinary and

usual rules of construction, all of the statutes governing the conduct of elections must be construed together, and that, when the Legislature enacted the absent voters' statute in 1913, it did so having in view section 1006 [§ 16–13–01] and other statutes touching elections and the construction and effect given to the same by this court, and contemplated that the same should apply.

. . . . .

"So it seems clear to us, applying these rules in the instant case, that we must hold that section 1006 [§ 16–13–01] applies to absent voters' ballots as well as to other ballots. It is urged that the chief reason for indorsement of ballots as required by section 985 [§ 16–12–04], that is, to make sure that the elector shall vote the official ballot and shall have no opportunity to substitute in place thereof an unofficial ballot which may have been marked prior to his coming to the polls, does not apply in the case of absent voters' ballots; that the Legislature has carefully safeguarded every step of the proceedings prior to the depositing of the absent voter's ballot in the ballot box so that this may not occur; and that the voter ought not to be deprived of the right to cast his vote through the default or neglect of election officers since he is not present and cannot protect himself in this respect. But it must be remembered that in granting the right to vote to absent voters the Legislature has the right to prescribe such reasonable requirements as it sees fit. So that regardless of reasons therefor the Legislature is well within its power in imposing such a requirement. If it imposes such a requirement and the voter knows that when absent from his polling place he votes at his peril as regards defaults of the election officers, he cannot complain. Besides, it cannot be said that there is no reason for the imposition of the requirement that the ballot be indorsed. As is said in the case of *Miller v. Schallern,* supra [8 N.D. 395, 79 N.W. 865 (1899)]:

" 'The reasons for this requirement are two-fold: First, to insure the use of the official ballot; next, to identify the ballot in case of contest. Though the first of these two reasons may not exist in the case of absent voters' ballots, the second does just as much in the one case as in the other.'

"It must also be remembered that the only provision made for the counting of ballots and prescribing the manner in which this shall be done is contained in section 1006 [§ 16–13–01]. The absent voters' statute says nothing whatsoever respecting the manner in which the votes shall be counted. It leaves this subject to pre-existing statutes, that is, to section 1006, and, as this court has repeatedly held . . . , the provision of section 1006, that ballots not indorsed with stamp and initials shall be void and not counted, is mandatory. We must presume, of course, that the Legislature had in mind section 1006 and the judicial construction put upon it when it enacted the absent voters' statute."

Such issue was again raised in *Torkelson v. Byrne,* 68 N.D. 13, 276 N.W. 134 (1937), wherein this court held, in paragraph 1 of the syllabus:

"1. Ballots which have not been indorsed as required by section 985, Comp. Laws 1913 [§ 16–12–04, N.D.C.C.], are void whether they be absent voters ballots or regular ballots."

It is urged that this court's holdings in *Weber* and in *Torkelson, supra,* are distinguishable on their facts because in these cases the precincts involved used paper ballots for those electors casting their votes in person, and because the absent voters' ballots were counted individually along with ballots cast by electors voting in person. We find no substance in such distinctions.

Absent voters' ballots cast in *Weber* and in *Torkelson* were just as easily distinguished from those ballots cast by electors voting in person as in the present proceeding because, in 1927 and in 1937, North Dakota law required that absent voters' ballots be of a different color than the ballots used by electors casting their votes

in person. Section 994, Comp.Laws 1913 [§ 16–18–03, N.D.C.C.]. Further, the fact that such absent voters' ballots are now registered on voting machines in the presence of two election officials of opposed interests, does not transform such absent voters' ballots into something not identifiable—such absent voters' ballots are still identifiable in the case of an election recount or election contest, are still capable of being inspected to evaluate their authenticity in the event of an election recount or election contest, and, if found to be void, they can be subtracted from the voting machine totals, as was done by the recount board in the present proceeding.

■ The contention is made that, because fraud has not been alleged in the casting of the 202 absent voters' ballots which were not endorsed with the official stamp and initials, they should be counted notwithstanding that the law specifically provides that such ballots are void. If we were to hold that unless fraud is alleged such ballots shall be counted, we would be encouraging such allegations in the future. An allegation of fraud is easily made but is difficult to prove. Certainly it would follow that we would have to require more than a mere allegation of fraud. We would need to require proof of fraud. What kind of proof would we require? The proof of fraud that is usually required to vitiate consent in a normal business transaction is proof that is clear and convincing. Such proof of fraud is difficult to obtain under most circumstances, and to require such proof of fraud in an election recount or an election contest would ultimately result in the encouragement of fraud itself. It is no doubt because of this difficulty and the consequences in the election process of such a requirement that the legislature required the stamping and initialing of ballots in order to prevent fraud in the first instance. Although we can conceive of means by which such a procedural safeguard might be circumvented, and although there may be other means that could be devised to prevent fraud, we cannot conclude that the means adopted by our legislature does "not contribute substantially to the integrity of the election process." *Craig v. Peterson*, 39 Ill.2d 191, 196, 233 N.E.2d 345, 348 (1968).

It should also be noted that the legislature also acts to discourage carelessness and possible connivance on the part of an election officer by providing that the failure on the part of an election officer to comply with the stamping and initialing requirement may constitute a class A misdemeanor. Section 16–01–17, N.D.C.C., provides, in pertinent part:

"*Election offenses—Penalty.*—It shall be unlawful for a person to:

"1. Fraudulently alter another person's ballot or substitute one ballot for another, *or to otherwise defraud a voter of his vote.*

. . . . .

A violation of subsections 1 through 6 of this section shall be a class A misdemeanor. . . ." [Emphasis added.]

Section 12.1–32–01(4), N.D.C.C., provides:

"*Classification of offenses—Penalties.*—Offenses are divided into six classes, which are denominated and subject to maximum penalties, as follows:

. . . . .

"4. Class A misdemeanor, for which a maximum penalty of one year's imprisonment, a fine of one thousand dollars, or both, may be imposed."

We thus find that this court's holdings in *Weber v. O'Connell* and in *Torkelson v. Byrne, supra,* to be controlling in the present proceeding. We find that § 16–13–01(1), N.D.C.C., which provides that: "In the canvass of the votes at any election, a ballot shall be void and shall not be counted if: (1) It is not endorsed with the official stamp and initials as provided in this title [Title 16] . . . ." applies to absent voters' ballots registered on voting machines pursuant to § 16–18–20, N.D.C.C., and where such absent voters' ballots are not so endorsed, they are void and cannot be counted.

Having determined that the decision of the district court in the present proceeding

is in accordance with North Dakota law, we now turn to petitioner's contention that the constitutional rights of the 202 absentee voters were violated by the voiding of their absent voters' ballots pursuant to such law. (Petitioner has not specified what particular constitutional rights of the 202 absent voters have been violated.) Petitioner appears to contend that such regulatory provision operates unequally upon equally qualified voters and that it does not contribute substantially toward ensuring the honesty and integrity of the election process. *Craig v. Peterson, supra* 233 N.E.2d 345, is cited in support of such contention. We disagree.

In *Porter v. Bainbridge*, 405 F.Supp. 83 (S.D.Ind.1975), the federal district court found that a rule adopted by the Indiana State House of Representatives not to count absentee ballots which did not bear the seal and initials of the county clerk and the precinct election clerk's initials in precincts in which the only paper ballots cast were absentee ballots did not violate such absentee voters' constitutional rights. Specifically, the federal district court found that such rule did not violate these absentee voters' First Amendment rights to freedom of speech, assembly, and petition for redress of grievances—as incorporated in the Due Process Clause of the Fourteenth Amendment; nor did such rule violate their rights to equal protection under the Equal Protection Clause of the Fourteenth Amendment. The federal district court in *Porter v. Bainbridge, supra* 405 F.Supp. at 91, found that such rule

"... requiring that the election clerks initial the ballots, is a reasonable and logical requirement to assure that only the ballots of properly registered and qualified voters are in fact deposited in the ballot box at the precinct. This procedure assures qualified and registered voters that their votes will not be diluted or nullified by votes of unqualified and unregistered persons."

The North Dakota Supreme Court, in *Weber v. O'Connell, supra* 215 N.W. at 541, stated:

"But it must be remembered that in granting the right to vote to absent voters the Legislature has the right to prescribe such reasonable requirements as it sees fit. So that regardless of reasons therefor the Legislature is well within its power in imposing such a requirement. If it imposes such a requirement and the voter knows that when absent from his polling place he votes at his peril as regards defaults of the election officers, he cannot complain. Besides, it cannot be said that there is no reason for the imposition of the requirement that the ballot be indorsed."

Our statutory scheme for handling absent voters' ballots cast on voting machines contemplates a time interval between the time the absent voters' ballots are opened and endorsed, pursuant to § 16–18–17, N.D.C.C., and the time they are registered on the voting machines, pursuant to § 16–18–20, N.D.C.C., "during the voting day at such intervals as are available when machines are not in use by voters". During this time interval, between step 1 and step 2, the absent voters' ballots are open and are subject to potential illegal substitutions or additions. By the lack of endorsement, the inspector would be unable to identify the absent voters' ballots voted in step 2 as being the same ballots opened in step 1.

In *Miller v. Schallern*, 8 N.D. 395, 79 N.W. 865, 866–867 (1899), wherein our Supreme Court first held that the statutory provision requiring that ballots be properly endorsed is mandatory, not directory, this court stated that:

"... counsel's utmost contention is that an enforcement of the statute as it reads may in some cases operate, and in the case at bar will operate, practically to deprive electors of their constitutional right to vote, and to have their votes counted. But this cannot be made a test of the validity of any regulative statute. There are many regulative provisions in election statutes the enforcement of which will and do operate to deprive voters of their privilege, and yet their consti-

tutionality cannot be successfully challenged. . . .

". . . But the case cited by plaintiff . . . while conceding to the lawmaker the general right of legislative control, holds that the prohibition against the counting of votes on which the initials of a precinct official are not written is an unreasonable regulation, and, as it may possibly operate, in isolated instances, to disfranchise the voter, it is therefore unconstitutional and void. But, in our judgment, this reasoning is fallacious, and moreover, trenches upon very dangerous ground. *It proceeds upon the false notion that it is the province of the courts to enter the conceded domain of the legislature, and, upon a question of the expediency of a given regulative measure, substitute the judgment of the courts for that of the constitutional body which has the original right to make the regulation.*" [Emphasis added.]

■ We find that the legislature could have concluded that the requirement of endorsement of absent voters' ballots is reasonable and logical to aid in assuring the integrity of the election process. The endorsement requirement is as valuable today in precincts using voting machines for electors casting their votes in person as such endorsement requirement was when first held applicable to absent voters' ballots fifty years ago, when electors casting their votes in person used different colored ballots than those used by electors casting absentee ballots. We find such requirement is intended to assure that only the ballots of properly registered and qualified voters are in fact registered on the voting machines and to assure qualified and registered voters that their votes will not be diluted or nullified by votes cast by unqualified persons.

■ Finally, we reach the question of whether fifteen qualified electors living in the 41st Legislative District of the State of North Dakota should be allowed, pursuant to Rule 24 of the North Dakota Rules of Civil Procedure, to intervene in the present proceeding. Such electors had cast absent

voters ballots at the general election of November 2, 1976, in which election they voted for their choices for State Representatives for the 41st Legislative District, which ballots were subsequently voided by the decision of the district court which is the subject of this proceeding.

It is contended that because there is no statute conferring on such electors a right to intervene, and because such electors' rights will be adequately represented by the parties to this proceeding, this court should deny intervention. We disagree.

Rule 24(a)(2), N.D.R.Civ.P., provides:

"*Intervention of Right.* Upon timely application anyone shall be permitted to intervene in an action: . . . (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties."

Although we believe that such electors' interests are adequately represented by the existing parties, we will, without indicating what we might do in future cases, allow intervention in this proceeding, pursuant to Rule 24(a)(2), N.D.R.Civ.P., because of the unique circumstances of this matter—i. e., that election recounts made pursuant to the requirements of § 16–13–47.1, N.D.C.C., must be conducted within a very short time frame, giving no practical opportunity for intervention prior to an election recount; and that the subject matter of this proceeding affects and concerns intervenors' rights to vote and have their votes counted.

Having thus decided to allow intervention, we find that the arguments made by the intervenors parallel arguments made by the petitioner and that they are adequately resolved earlier in this opinion, with the exception of one issue—Does the application of § 16–13–01(1), N.D.C.C., violate Section 122 of the North Dakota Constitution, which provides:

"*Section 122.* The legislative assembly shall be empowered to make further ex-

tensions of suffrage hereafter, at its discretion, to all citizens of mature age and sound mind, not convicted of crime, without regard to sex; but no law extending or restricting the right of suffrage shall be in force until adopted by a majority of the electors of the state voting at a general election."

We find no distinction between the application of § 16–13–01(1), N.D.C.C., to the present proceeding and its application as to any elector voting on a paper ballot in North Dakota—all paper ballots are subject to the same endorsement requirement and will be declared void and not counted if not so endorsed. This court has consistently held since 1899 that such statutory provision is a valid enactment and is not repugnant to any provision of the North Dakota Constitution. *Miller v. Schallern*, 79 N.W. 865, *supra* ¶ 2 of Syll.

We find it appropriate to conclude with an observation made by this court in 1899:

"If experience should show that the provisions of section 524 [§ 16–13–01, N.D.C.C.] are unnecessarily rigid,—we do not think it will,—then it will become the duty of the legislature to intervene and devise some different regulation of the elective franchise." *Miller v. Schallern, supra*, 79 N.W. at 868.

The relief requested in the petition for review is denied; the relief requested in the petition of the intervenors is denied; and the provisions of § 16–13–01, N.D.C.C., are held to be constitutional, mandatory, and applicable to absent voters' ballots cast in precincts using voting machines.

ERICKSTAD, C. J., concurs.

SAND, Justice. (Special opinion, concurring in result, dissenting on jurisdiction).

In my opinion, this court should not have exercised its original jurisdiction. Neither the subject matter as presented, nor the parties, come within § 86 of the North Dakota Constitution (new Judicial Article), or § 27–02–04, North Dakota Century Code, nor do they meet the requirements of § 16–01–10, NDCC, because the petitioner made no showing that an error, wrongful act, or neglect of duty had occurred or is about to occur.

The petitioner's primary complaint, in effect, was that the recount board in canvassing the absentee ballots followed the letter of the law, which is claimed it should not have done. Compliance with the law cannot constitute "error," "neglect," or a "wrongful act" so as to rely upon § 16–01–10, NDCC, for jurisdiction. The petitioner claimed and argued that the statutes relating to the counting of absentee ballots should have been construed by the supervising district judge so as to count absentee ballots in precincts where voting machines were used even though the ballots did not have the official stamp or initials, in spite of the specific provisions of § 16–13–01, NDCC.

Section 16–13–01, NDCC, as is material here, provides:

"In the canvass of the votes at any election, a ballot shall be void and shall not be counted if:

"1. It is not endorsed with the official stamp and initials as provided in this title; . . ."

A related pertinent provision of § 16–18–17, NDCC, is as follows:

". . . They [election board] shall take out the ballot or ballots contained therein without unfolding the same, or permitting the same to be opened or examined, and after endorsing the same as other ballots are endorsed, they shall deposit the ballot in the proper ballot box and show by the records of such election that such elector has voted. . . ."

I don't believe any question can be seriously raised that the terms "endorsing" or "endorsed" do not mean officially stamped and initialed.

The petitioner also contended that the provisions of §§ 16–18–20, 16–18–17, and 16–13–01, NDCC, should be construed as being directory rather than mandatory in precincts where voting machines are used, and that the absentee ballot should be coun-

ted regardless of the absence of the stamp and initials.

The statutes in question, however, are clear and unambiguous and leave little, if any, room for construction. They make no exception in instances where voting machines are used.

The petitioner presented no facts disclosing the procedure followed by the election board in processing the absentee ballots. Such facts may have been helpful, and possibly could have some bearing on the principal issues involved here. I must assume that the petitioner had reason not to present any facts or evidence. Significantly, during oral argument, it was stated (and not contradicted) that the absentee ballots were not placed in the ballot box (none being present) but were kept at different places in the voting precinct. This in my view does not constitute a basis for giving the statute in question a directory rather than a mandatory construction. It, however, indicates to me that if the action had been brought in a quo warranto proceeding, or some other comparable action, various facts which may have a bearing on the situation would have been developed.

The position taken and the arguments made in this case should have been made and raised by the petitioners in *State ex rel. Olson v. Thompson*, heard earlier. We are in no position to speculate as to why this argument wasn't raised at that time.

The district court, Judge Beede, in supervising the recount was not acting as a court, as that term is normally understood. By way of illustration, even though not precisely comparable, many district courts are required to supervise or administer trusts, but this does not change the supervision aspects by the judge into a court. It might be argued that because we exercised jurisdiction in the *Olson v. Thompson* case in early December we should do so here. However, in the *Olson* case the subject matter was an order of the district court prohibiting the State Canvassing Board from performing an administrative duty. The jurisdiction of this court existed as a result of the ex parte writ issued by the district

court by virtue of the provisions of § 86 of the new Judicial Article and § 27–02–04, NDCC. The writ of the district court constituted an interference with the proper function of the State Canvassing Board. Normally, even under those conditions, the court would generally be reluctant to exercise its original jurisdiction and would require a request first made to the district court to rescind the writ of prohibition. *State v. Lynch*, 138 N.W.2d 785 (N.D.1965). But because of the time element, such procedure was not required. If this court had insisted upon such procedure, the election process would have been interrupted, preventing the results from being known by a certain time, which would have left the election process incomplete at the time the House of Representatives had its organizational meeting. At the earlier proceedings, *State ex rel. Olson v. Thompson*, the question of the absentee ballots was not raised.

Since the *Thompson* case has been heard and decided, the "dispute" between Kuhn and Wentz was presented to the House of Representatives after the election process had been completed. The "dispute" was presented to the Legislature by a motion and the question pertaining to the counting of the absentee ballots without the endorsement or initial was made in connection with the motion. This case is, therefore, readily distinguishable from the *Olson v. Thompson* case, because in the prior case the election process was still underway, and was being interrupted by a writ of prohibition by the district court.

In my opinion, once the subject matter has been presented to the Legislature under the provisions of § 47 of the North Dakota Constitution, the courts, including the supreme court, may no longer exercise jurisdiction over the same subject matter.

Even though the leaders in the House entered into an agreement of some kind which is subject to construction as to specifically what it was meant to accomplish, it is nevertheless a firm principle of law that jurisdiction cannot be conferred by consent or agreement, which in my opinion applies

to the agreement reached by the leadership in the House.

Referring again to the statute which specifically provides that ballots not officially stamped or endorsed are deemed void and are not to be counted, the construction contended by the petitioner would require complete disregard for the language in the statutes, because the language is clear and unambiguous. I would further note that the statute would have to be declared unconstitutional to reach the result prayed for by the petitioner. In a somewhat similar situation, § 16–01–11, NDCC, requiring residence and postoffice and an affidavit by the circulator, was challenged as being unconstitutional in that it violated the provisions of § 25 of the North Dakota Constitution. This court, in *Wood v. Byrne*, 60 N.D. 1, 232 N.W. 303 (1930); *Schumacher v. Byrne*, 61 N.D. 220, 237 N.W. 741 (1931); and *Dawson v. Meier*, 78 N.W.2d 420 (N.D.1956), held that the statutory provisions were valid, even in the face of the provisions of § 25 of the Constitution, which provided, in part,

"No law shall be enacted to hamper, restrict, or impair the exercise of the rights herein reserved to the people. . . ."

The rights referred to were the initiative and referendum, which employ the petition to accomplish its purpose.

In my opinion, the legislature not only has a right, but has a duty, to enact laws preserving the integrity of the free and open election process.

Based on case law, I am firmly convinced that the question of jurisdiction should be, and may only be, decided on principles of law. Any other reason would be inadequate.

This court in a number of instances has said that it will exercise its superintending power only under conditions that are tantamount to a denial of justice. *Stormon v. District Court of Pierce County*, 76 N.D. 713, 38 N.W.2d 785 (1949); *Schaff v. Kennelly*, 69 N.W.2d 777 (N.D.1955). This court has also said that it will not exercise its extraordinary powers except when there is no other adequate remedy at law. *State ex rel. Johnson v. Broderick*, 75 N.D. 340, 27 N.W.2d 849 (1947). There is at least one other adequate remedy at law, namely, quo warranto.

Petitioner has not met the requirements laid down by this court which need to be met before it will exercise its original jurisdiction.

If the petitioner (Kuhn) had the desire to proceed through the judiciary, notwithstanding § 47 of the North Dakota Constitution and notwithstanding the fact that the question had been presented to but not accepted by the House of Representatives, and if any court were to exercise jurisdiction, the proper action would have been quo warranto, which is designed to resolve, amongst other things, election issues.

For these reasons, I would have denied the petition requesting this court to exercise its original jurisdiction.

However, because the majority of this court has reached the conclusion that this is a proper case for the court to exercise jurisdiction and has assumed jurisdiction, but some members have reached different results, I deem it advisable to express my position on the merits. Without compromising my position on the question of jurisdiction, but merely recognizing that jurisdiction has been assumed, I concur in the results reached by the opinion written by Justice PAULSON and signed by Chief Justice ERICKSTAD.

VOGEL, Justice, dissenting.

The opinion of the majority is an exercise in textual analysis which pays little heed to the fact that it is disenfranchising 202 voters. It cites the text of statutes and court decisions 40 to 50 years old or more as if they were graven on stone. The opinion says nothing about the "spirit of the law" which was held by the same Justices only four weeks ago [*Olson v. Thompson*, 248 N.W.2d 347 (N.D.1976)] to justify wholesale disregard of mandatory statutes. In the opinion of four weeks ago they said, at four different places, that statutes could be disregarded because they required only "idle acts."

Today the majority forgets about the "spirit of the law" and makes 202 idle acts out of the solemn acts of voting by 202 citizens of this State.

A majority which feels free to choose between the "letter of the law" one day and the "spirit of the law" another day will always be triumphant but it will not always be right.[1]

Fortunately, we need not resort to such amorphous concepts as the "spirit of the law" to demonstrate the fallacies in the majority opinion.

That opinion, besides relying primarily on precedents 40 or 50 or more years old, disregards the constitutional rights of the 202 voters and misapprehends a Federal district court decision and virtually disregards authoritative and convincing interpretation of statutes like ours by the Supreme Court of a sister State. Besides that, it ignores prior interpretations of our statutes by our own district courts, which surely are entitled to more deference than the decision of a Federal district judge in another State, even if it applied, which it does not. Most important of all, it disregards controlling principles of constitutional law which have developed since its half-century-old cases were decided.

## THE STATUTES

The majority opinion sets forth some of the statutes which we are called upon to interpret—Sections 16–12–04, 16–13–01, 16–18–17, and 16–18–20. To these should be added some provisions of Chapter 16–18 relating to absent voters ballots. Without giving them in detail, we mention that 16–18–01 allows voters who are or expect to be absent on election day or who are physically disabled or in the military or naval services to vote by absent voters ballots [§§ 16–18–01 and 16–18–02, N.D.C.C.]; that the application for such a ballot, witnessed, shall be furnished to the proper official (in the case of legislative elections, the county auditor), except that those in military service are not required to use a formal application [§ 16–18–06, N.D.C.C.]; that the ballots are to be delivered or sent by the county auditor to the elector by mail, together with an envelope preaddressed to the county auditor, containing a form of affidavit swearing to residence and entitlement to vote in a specific precinct [§ 16–18–09, N.D.C.C.]; and the county auditor delivers returned ballots to the proper precinct [§§ 16–18–15 and 16–18–16, N.D.C.C.].

## THE CASE LAW

The first North Dakota case construing the statutes as to stamping and initialing ballots was decided before there were any absent voters ballots. It was *Miller v. Schallern*, 8 N.D. 395, 79 N.W. 865 (1899). Two other cases, decided the same year in the same way, were *Lorin v. Seitz*, 8 N.D. 404, 79 N.W. 869 (1899), and *Howser v. Pepper*, 8 N.D. 484, 79 N.W. 1018 (1899).

*Miller* involved ballots cast in person at the polls which were not initialed by the inspector or judges of the election. It was held, relying on the statute (§ 524, R.C. 1899), which was a precursor of Section 16–13–01, N.D.C.C., that the statute governed and the votes could not be counted. A principal basis for the holding was that the voter himself had the means of making sure that he did not lose his vote, because he could examine the ballot to make sure that it was stamped and initialed and he therefore had "an opportunity to see and know personally whether or not he is voting

---

1. Before we leave the topic of the "spirit of the law" we invite comparison between the majority opinion in *Olson v. Thompson, supra,* and the holding of the district court in the case now before us. The opinion of the district court says this:

"There is reason, as pointed out by Mr. Eaton, why an election where all of the ballots cast are cast on the machine and the only paper ballots involved are those received from absentee voters. That the spirit of the law is not served by throwing those paper ballots out because they do not contain the initials and/or stamp of the inspector or the judge of the election.

"Good arguments can be made that the spirit of the law is usurped by throwing those ballots out. Unfortunately, the Legislature hasn't seen fit to modify the letter of the law to meet the spirit of the law."

a lawful ballot—i. e., an official ballot," and therefore "the loss of the vote is the result of the voter's own acts."

In *Fuerst v. Semmler*, 28 N.D. 411, 149 N.W. 115 (1914), two precincts were improperly consolidated for voting purposes, the stamps of the two precincts were used, and the ballots were deposited in the same ballot box. The court held that the ballots should be counted, saying:

"Although the statute requiring the authentication of the ballot is mandatory, a literal compliance therewith is not exacted. A substantial compliance was observed and this is all that was required. While, no doubt, it was the elector's duty to see that his ballot was authenticated in substantial conformity to the statute, it would be an exceedingly harsh and needless rule that would require that he should, at the peril of having his vote not counted, see that the statute had been literally observed by the election officers.

.   .   .

".   .   . To attribute to the Legislature such an absurd intent is equivalent to attributing to it an intent to lay a trap for the unsuspecting and good-faith voter which he is almost certain to be caught in, and whereby his vote may, at the behest of dishonest or careless election officials, be held for naught." 149 N.W. 115, at 119–120.

Another case of some interest is *Perry v. Hackney*, 11 N.D. 148, 90 N.W. 483 (1902), where the results of the election in a precinct were challenged because the voting booths were not screened, so that the voters were visible while marking their ballots. This court said [quoting *Parvin v. Wimberg*, 130 Ind. 561, 30 N.E. 790, 15 L.R.A. 775, 30 Am.St.Rep. 254 (1892):

"'.   .   . If a statute expressly declares any particular act to be essential to the validity of an election, or that its omission shall render the election void, the courts, whose duty it is to enforce the law as they find it, must so hold, whether the particular act in question goes to the merits or affects the result of the election

or not; for such a statute is mandatory, and the court cannot enter into the question of its policy. On the other hand, if a statute simply provides that certain things shall be done within a particular time or in a particular manner, and does not declare that their performance shall be essential to the validity of an election, they will be regarded as mandatory if they affect the merits of the election, and as directory only if they do not affect its merits." 90 N.W. 483, at 485.

This court also said:

"The violation of duty in this case was by the officers conducting the election, and not by the electors, and the latter were not in fault. The weight of judicial opinion is to the effect that, in the absence of fraud, a voter, who has nothing to do with the preparation of the ballots or matters preliminary to the election, should not be deprived of his right to have his vote counted because of the wrongful act of the election officers." 90 N.W. 483, at 486.

Then came *Weber v. O'Connell*, 55 N.D. 867, 215 N.W. 539 (1927), upon which the majority places much reliance. This court there refused to follow the rationale of the prior cases, which had either held directions to election officers to be directory or had put the blame on the voters for not making sure that their ballots were valid, and held, for the first time, that voters could be disenfranchised by acts of election boards which they knew nothing of and had no way to prevent. Then years later, this harsh rule was followed in *Torkelson v. Byrne*, 68 N.D. 13, 276 N.W. 134, 113 A.L.R. 1213 (1937). Neither of these cases even touched upon constitutional issues which we believe are controlling now. And neither involved voting on voting machines. They obviously are of slight value in solving the problems of this case for these reasons, as well as their vintage.

The only case law from other jurisdictions to which we have been referred, or which we can find, involving absent voters ballots is *Craig v. Peterson*, 39 Ill.2d 191, 233 N.E.2d 345 (1968). Illinois' Election

Code, Section 17–9, was, in all pertinent respects, substantially identical to our Section 16–12–04, referred to above, and Illinois' Election Code Section 19–9 was in all pertinent respects substantially identical to Section 16–18–17, referred to above. The Illinois court had this to say:

"While this court has had no occasion to consider the constitutionality or the effect of these provisions in an election in which both voting machines and paper ballots have been used, questions relating to the validity of uninitialed ballots in an all-paper ballot election have frequently been presented and it is now well established, despite earlier decisions to the contrary, that the statutory requirement that election judges initial the ballot before it is placed in the ballot box is a mandatory provision, and that no ballot without such initials may be counted, regardless of whether it be an absentee ballot or otherwise. [Citations omitted.] We have not, however, considered the question in the context here presented, and we agree with the intervening appellants that their disenfranchisement, without their fault, by application of the initialling requirement to their paper ballots in an otherwise machine election poses substantial problems under section 18 of article II of our constitution which provides: 'All elections shall be free and equal', and section 1 of article VII, providing that all persons possessing the qualifications therein specified 'shall be entitled to vote at such election,'[2] as well as under the fourteenth amendment to the United States constitution. . . . Likewise, the Federal courts have evinced similar concern. While there concerned with apportionment problems, the statements of the United States Supreme Court in *Reynolds v. Sims*, 377 U.S. 533, 554–555, 84 S.Ct. 1362, 1377–1378, 12 L.Ed.2d 506, 523, are *apropos*: 'Undeniably the Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections. * * * It has been repeatedly recognized that all qualified voters have a constitutionally protected right to vote, [citation] and to have their votes counted, [citation]. In *Mosley* [*United States v. Mosley*, 238 U.S. 383, 35 S.Ct. 904, 59 L.Ed. 1355] the Court stated that it is "as equally unquestionable that the right to have one's vote counted is as open to protection * * * as the right to put a ballot in a box." * * * The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government.'

"While the necessity of, and legislative authority to establish, reasonable rules assuring the honest and orderly conduct of elections is obvious, it is apparent from the above cases that statutory requirements which, absent fault on his part, deprive a fully qualified voter of his right to vote or to have his vote counted are constitutionally suspect, particularly where such requirements do not substantially promote the secrecy and integrity of the election. . .

.    .    .    .    .

"It is noteworthy that in the numerous cases in this court involving uninitialled ballots, the constitutionality of that requirement seems not to have been challenged nor discussed other than inferentially. The absence of such challenge is likely accounted for by the fact that such requirement, as applied to an all-paper ballot election, is a patently reasonable one in that it serves a salutary purpose by enabling the election judges to identify those ballots which they have personally initialled and therefore constitutes an effective safeguard against corrupt practices such as 'stuffing' a ballot box. [Citation omitted.] Likewise the same considerations have been held to apply to absentee ballots in an all-paper ballot election for there is no other equally effective method of identifying and separating the legally cast from the illegally cast votes. [Citations omitted.] But it is not at all

2. The North Dakota Constitution, Article V, Section 121, provides that every person meeting citizenship, residence, and age requirements "shall be a qualified elector at such election."

clear as to the manner in which the sanctity and integrity of an election is promoted by applying the rule to exclude uninitialled absentee ballots cast by qualified voters in an election in which the only paper ballots used on the issues or offices in question are those voted by the absentees, and this is particularly true where, as here no question of fraud or tampering is presented, and it is stipulated that the ballots in question are in fact the same ballots delivered by the county clerk's office. Under these circumstances we believe these uninitialled absentee ballots could properly be counted, and that the statutory commands construed in [citations omitted] to be mandatory in an all-paper ballot election must be held only directory when applied in the context of the case before us.

.    .    .    .    ..

"No useful purpose would be served by a detailed consideration of the other cases in which the initialling requirement has been held mandatory and uninitialled ballots rejected. Each involved an all-paper ballot election, and the basic considerations have been the same. The statute requires the ballots to be initialled, it commands that no unindorsed ballot shall be counted, this requirement substantially contributes to the integrity of the election process and is a valid, mandatory provision which the courts must enforce. But this reasoning simply does not apply with equal force to the situation before us where the initialling requirement, in the circumstances of this case, contributes not at all to the integrity of the election process; it does not assist in identifying the ballots for no identification problem exists, nor can a problem exist where the only paper ballots cast for these offices were the absentee ballots; it does not assist in separating the illegally cast from the legally cast ballots for there were no other paper ballots for public offices and there is no claim that these absentee ballots were altered, tampered with or in any way improperly preserved—in fact it is stipulated that these are the identical ballots received by the absentee voters from the county clerk. The net result of a mandatory application of the initialling requirement to the

absentee ballots in the circumstances of this case would be to disenfranchise a substantial number of qualified voters who have done everything in their power to comply with the law, a result which neither our State nor Federal constitutions will tolerate where, as here, the rule causing their disenfranchisement made no substantial contribution to the integrity of this election. [Citations omitted.] In fact, the initialling requirement as to absentee ballots, if held valid and mandatory in this case, might well serve as the means of achieving the very result it was intended to prevent, for corrupt election judges could deliberately refrain from initialling ballots of those absentee voters whom they had reason to believe voted otherwise than the judges desired. This possibility, of course, always exists as to absentee ballots; the difference between the ordinary situation and this is that in an all-paper ballot election there is no other means of identifying the legally cast ballots. The necessity, in order to guarantee the integrity of the election, of some such method of separating the legally cast ballots from those illegally cast suffices to make its application in the usual case constitutionally permissible even though it results in disenfranchisement of those absentee voters whose ballots are uninitialled. No such necessity or justification exists in the case before us.

.    .    .    .    .

"It is our duty to so interpret a statute as to promote its essential purposes and to avoid, if possible, a construction that would raise doubts as to its validity. [Citations omitted.] We therefore hold the statutory requirements relating to the initialling of ballots by election judges are directory, rather than mandatory, when considered in relation to an election where the only paper ballots used on the issue or office in question are those of absentee voters, and the only irregularity complained of is the absence of such endorsement." *Craig v. Peterson*, 233 N.E.2d 345, 347–351.

We believe these arguments are simply unanswerable, and unanswered in the majority opinion. We adopt them as our own.

The majority makes no attempt to distinguish *Craig v. Peterson, supra,* and misunderstands the only other decision it cites involving a constitutional question, *Porter v. Bainbridge,* 405 F.Supp. 83 (S.D.Ind. 1975), a Federal district court case. The action was based on alleged violations of Federal statutes (conspiracy and civil rights). The court gave twelve reasons why the complaint did not state a cause of action under Federal law. One was that the Indiana Legislature, under the State Constitution, was the sole judge of the qualifications of its members. Others related to the requirements of the Federal conspiracy and civil-rights laws. Most important, the issue before us was not even raised, as is shown when we copy the full paragraph from which the majority excerpted one sentence and part of another:

"2. Plaintiffs' complaint, and the facts set forth above, fail to state a claim upon which relief can be granted based on 42 U.S.C., Section 1983. *Plaintiffs do not allege that either the provisions of the Indiana Election Code requiring that the precinct election clerks place their initials on absentee ballots when they are delivered to the polls and that ballots which do not contain such initials of the clerks may be protested and rejected,* or the rules adopted by the Select Recount Committee providing that all absentee ballots and paper ballots which do not contain the initials of the precinct election clerks will not be tallied, *are facially unconstitutional under the Fourteenth Amendment to the United States Constitution.* They allege only that in adopting such rule and applying it to the recount of votes for Representative in the Twenty-Third District, the Select Recount Committee, and the House of Representatives in approving the report of such Committee, failed to follow decisions of the Indiana Supreme Court holding that in counting votes for purposes of statutory recount or contest proceedings under the appropriate provisions of the Indiana Election Code absentee ballots should be counted regardless of whether they contain the initials of the precinct election clerks.

Allegations of a violation of rules or requirements of state law are insufficient to state a claim for relief under 42 U.S.C., Section 1983. Moreover, *plaintiffs' complaint does not allege,* and the facts set forth above do not tend to prove, *any violation of plaintiffs' voting rights* or plaintiffs' First Amendment rights to freedom of speech, assembly and petition for redress of grievances, as incorporated in the Due Process Clause of the Fourteenth Amendment. In so far as plaintiffs rely on the Equal Protection Clause of the Fourteenth Amendment, *they fail to allege any intentional and purposeful discrimination against an identifiable class or group. The Select Committee's Rule No. 3, requiring that the election clerks initial the ballots, is a reasonable and logical requirement to assure that only the ballots of properly registered and qualified voters are in fact deposited in the ballot box at the precinct.* This procedure assures qualified and registered voters that their votes will not be diluted or nullified by votes of unqualified and unregistered persons." *Porter v. Bainbridge,* 405 F.Supp. 83, at 90–91.

Thus it will be seen that (1) the language quoted by the majority relates only to the rules of the House committee and not to the Indiana statute, (2) the complaint did not allege any violation of voting rights, and (3) the complaint did not allege that the statute was void on its face under the Fourteenth Amendment. None of these reasons applies here. Besides, we are not a Federal district court, instructed to apply doctrines of abstention in construing State law. We are the highest court of this State, construing our own law.

We come now to the latest interpretations of our own law, in our own State. We are advised by one side, and it is not disputed by the other, that two years ago, in a statewide election contest between the incumbent Republican United States Senator and his opponent, the six presiding judges of our six judicial districts, appointed by us to supervise the recount, faced the same question we are now deciding, and that

they decided to count all of the contested absent voters ballots from machine precincts which were not initialed and stamped. While the case was not appealed to us, surely we should give some weight to the interpretation placed on the identical statutes and decisions we are now construing, by the judges we have appointed to administer the courts of all the other district judges in the State. *Fargo Public Library v. City of Fargo Urban Renewal Agency*, 185 N.W.2d 500 (N.D.1971). We dissenters do so, while the majority does not.

A few other comments may be apropos:

1. The majority says that the provisions of Section 16–18–17, N.D.C.C., are mandatory, particularly the portion relating to "endorsing" the ballots. The word "endorsing" appears in this context:

"... *and after endorsing the same as other ballots are endorsed,* they shall deposit the ballot in the proper ballot box ..."

We are advised by all parties, in oral argument, that there were no ballot boxes in any of the precincts where the challenged votes were cast. Obviously, the portion of the statute as to deposit of ballots was disregarded, yet no one asks to have all the ballots voided for that reason. It is a little difficult to understand how one part of a clause is mandatory, but the other part, not even separated by a comma, is not. The majority opinion, using the logic that statutes are "mandatory" rather than "directory" when the language is a clear expression of the legislative intent, then proceeds to ignore all of the language which obscures the intent of the Legislature.

2. It was stipulated by the attorney for Wentz, during the recount, that no question was being raised as to the identity of the challenged ballots, and that no evidence of fraud was to be presented. In view of this, the concern of the majority for the possibility of fraud is, to put it mildly, misplaced. Apparently 202 voters are to be disenfranchised and a candidate who received fewer votes than an opponent is to be declared elected, because, by a farfetched feat of

imagination the possibility of fraud can be found to exist. Similar feats of imagination were disregarded in *Craig v. Peterson, supra.*

## CONCLUSION

We conclude that the 202 voters were improperly and unconstitutionally disenfranchised; that the 202 ballots should have been allowed, and that either the county board of canvassers. may be recalled into session pursuant to statute, Section 16–13–15, N.D.C.C., or that the State Board of Canvassers may be recalled into session, pursuant to Section 16–13–47.1, N.D.C.C., and the procedure approved in *Olson v. Thompson, supra,* to recertify the result after including the 202 votes. Among our reasons are these:

a. We adopt the rationale and reasoning of *Craig v. Peterson, supra,* the only case in point. We could not improve upon the language we have quoted, and we adopt it.

b. We must, if we can, construe a statute so as to avoid constitutional questions. This construction does so.

c. We believe that recent Federal constitutional cases relating to voting rights require the result we have reached. Just as a State must show a substantial and compelling reason for imposing durational residence requirements in the face of undisputed actual residence [*Dunn v. Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972)], we believe it must show a substantial and compelling reason for disenfranchising one whose vote was cast in good faith and without fraud or neglect on his part.

The right to vote is "a fundamental political right . . . preservative of all rights." *Reynolds v. Sims,* 377 U.S. 533, 562, 84 S.Ct. 1362, 1381, 12 L.Ed.2d 506, 527 (1964).

We believe the disenfranchisement of the 202 voters is also unconstitutional, under developing Federal law, because it restricts the right to travel. See *Dunn v. Blumstein, supra.* One who does not travel from his precinct on election day will have his vote

counted. If his ballot is not stamped and initialed, he may require it to be stamped and initialed. If he votes by voting machine, he is sure the vote will be counted. But one who travels on election day, although allowed to vote in advance, is at the mercy of careless or corrupt officials who may so act as to disenfranchise him by failing to stamp or initial his ballot, thereby destroying his franchise without any fault on his part. We believe this violates the Equal Protection Clause of both the State and Federal Constitutions. *Dunn v. Blumstein, supra*; Thirteenth Amendment, United States Constitution; Section 20, North Dakota Constitution.

d. The petitioner here raises a constitutional question not raised in this court previously. Our prior decisions therefore provide no precedent on the constitutional question which we believe should be decided in favor of the validity of the 202 challenged absent voters ballots.

e. We notice that our statutory scheme now provides for the counting of some absentee ballots which are not stamped or initialed by the precinct election officials or by anyone else. See Section 16–18–14, N.D. C.C., providing for counting by the county canvassing board of absentee ballots which arrive too late to be forwarded to the election boards, without stamping or initialing by anyone. Ten such ballots were counted by the canvassing board in the present case (as appears from the record in this case). Under the rationale of the respondents, these would be disallowed and their voters disenfranchised.

f. It is obvious that the full range of statutes relating to elections cannot be applied literally to recounts of returns of absent voters ballots in precincts which use machines for voters appearing in person. As we have said, the officials cannot put absent voters ballots in ballot boxes if they have no ballot boxes. It is impossible to "recount" votes placed in machines by voters appearing in person.

Obviously, when statutes adopted at different times cannot be fully reconciled, interpretation is necessary. When something

as fundamental as the ballot is concerned, interpretation should favor the right to the franchise. We have statutory rules of interpretation. They are found in Sections 1–02–38 and 1–02–39, N.D.C.C., and provide:

"1–02–38. *Intentions in the enactment of statutes.*—In enacting a statute, it is presumed that:

"1. Compliance with the constitutions of the state and of the United States is intended.

"2. The entire statute is intended to be effective.

"3. A just and reasonable result is intended.

"4. A result feasible of execution is intended.

"5. Public interest is favored over any private interest."

\*     \*     \*     \*     \*     \*

"1–02–39. *Aids in construction of ambiguous statutes.*—If a statute is ambiguous, the court, in determining the intention of the legislation, may consider among other matters:

"1. The object sought to be attained.

"2. The circumstances under which the statute was enacted.

"3. The legislative history.

"4. The common law or former statutory provisions, including laws upon the same or similar subjects.

"5. The consequences of a particular construction.

"6. The administrative construction of the statute.

"7. The preamble."

Applying these rules, we read the statutes of this State so as to make them constitutional and to uphold the fundamental right to vote. We will not disenfranchise 202 voters, if it can be avoided, for reasons which we believe to be hypertechnical, illogical, and contrary to accepted doctrines of statutory construction.

g. The numerous precautions of the statutes on absentee voting provide so many safeguards that they more than ade-

quately substitute for any guarantees implicit in the stamping and initialing procedure. These precautions include (1) an application signed by the voter (except if in military service) [§§ 16–18–05, 16–18–06, and 16–18–11]; (2) sworn statement of voter on the envelope accompanying the ballot when returned [§ 16–18–09]; (3) certification of receipt of the ballot by a "proper officer" (in this case, the county auditor) and delivered with the ballots to precinct election officials [§ 16–18–16]; and (4) comparison of application and affidavit, and checking the qualifications of the elector, by the election officials before counting the vote [§ 16–18–17]. Where absent voters ballots are tallied on machines, additional precautions exist in that the machine is operated by representatives of both parties [§ 16–18–20].

h. We are reluctant to disenfranchise voters without sufficient reason, in the face of constitutional requirements. We have always held the right to vote to be a basic constitutional right in this country. To have that vote taken from 202 electors, for reasons which have nothing to do with any fault whatever on their part, and based solely on the failure of election officials to perform a technical requirement, is abhorrent to our ideals and our form of government and violative of a fundamental constitutional right.

Justice PEDERSON joins me in this dissent.

PEDERSON, Justice (dissenting).

We had the opportunity in the case of *State ex rel. Olson v. Thompson*, 248 N.W.2d 347 (N.D.1976), to apply § 47 of the North Dakota Constitution with a sense of balance and practicality, and in accordance with precedent. *Leu v. Montgomery*, 31 N.D. 1, 148 N.W. 662, 663 (1914), pointed out that " * * * by section 47 of the Constitution each branch of the Legislature is made the judge of the election and qualifications of its members, and the courts,

therefore, have no jurisdiction in such cases." If there is anything that is clearly mandatory in all of this, it is § 47 of the Constitution.

In *State v. District Court of Sixth Judicial Dist.*, 67 N.D. 196, 271 N.W. 137, 143 (1937), this Court said: "It is well settled that the courts should not assume authority to take any steps in legislative contests unless clearly authorized, and then only to the extent specifically given." *State v. Quam*, 72 N.D. 344, 7 N.W.2d 738 (1943), interpreted § 47 to mean that each House of the Legislature is the "sole judge" of election returns and the qualifications of its members.

This Court ignored these precedents and chose instead to follow the statement in *State v. Meyer*, 20 N.D. 628, 127 N.W. 834, 837 (1910), that: "This court does not attempt to say what members shall be seated. It is simply passing upon the question of law presented * * * " and "It is unnecessary for us to consider whether our decision may have any effect upon the action of the Senate * * *." My problem was then and is now that I cannot ignore the fact that our "decisions" do have some effect upon the action of the House. This is very vividly illustrated in the instant case by the Journal of the House for the Forty-fifth Legislative Assembly's organizational session. There, at pages 4 through 9, we see, not in an informal colloquy but in formal statements by the leaders of the House, comments that indicate that we left the definite impression by our previous decision that the House is only the "final" judge, not the "sole" judge of who shall be seated, and that either the Supreme Court or the Secretary of State had already made the decision for the House.

It may not be "judicial" to say "I told you so," but I haven't been a judge long enough to forget that I should also be practical. Lest I be misunderstood, I reiterate that when a challenged election result involves members of the Legislature, the only function of the courts, the election or canvassing boards, and the Secretary of State is to

facilitate the determination to be made by the House or the Senate. It makes no difference that the House or the Senate chooses to leave the decision to the Court or to the Secretary of State. Section 47 of our Constitution prohibits them from doing so.

Because this decision will be precedent for election disputes involving non-legislative offices, I choose to go along with Justice VOGEL's dissent because it would disen-franchise fewer voters. If we had decided *Olson v. Thompson, supra,* in accordance with my thoughts, I would now have agreed with Justice SAND.